E-FILED
Thursday, 01 October, 2020  02:34:18 PM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA

     Plaintiff-Appellee,

          v.

SHAMAR BETTS,

     Defendant-Appellant.

Case No. 20-cr-20047

## MOTION TO DISMISS INDICTMENT

The Defendant, Shamar Betts, by and through his attorneys, Elisabeth R. Pollock and Thomas A. Drysdale, files this Motion to Dismiss Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3) and the First, Fifth, and Sixth Amendments to the United States Constitution and in support thereof states as follows:

### I.    Procedural and Factual Background

On June 5, 2020, the United States Attorney for the Central District of Illinois filed a criminal complaint charging Shamar Betts with "inciting a riot" in violation of 18 U.S.C. § 2101(a) (the "Act'"). R. 1 at 1. On July 7, 2020, the grand jury returned an indictment charging Mr. Betts with the same. R. 15.

Factually, the government has alleged that Mr. Betts, through the use of the social media platform "Facebook," encouraged others to meet at the Marketplace Mall in Champaign, Illinois, for the purposes of vandalizing and/or looting businesses in the

surrounding area on June 1, 2020. R. 1 at 3-6. Specifically, the government alleges that Mr.

Betts posted the following message on his Facebook account:

> I'm just the messenger We're literally sitting on our ass watching the whole country and even others fight for our black rights Y'all think we don't suffer through inequality here EVERYDAY We gotta put Champaign/Urbana on the map mfs gone hear and fear us too. SLIDE let's get busy Justice for George FUCK12.

R. 1 at 5.

The government alleges that the Facebook post was also accompanied by a "flyer" telling people to meet a Marketplace Mall for a "riot" at 3[1] and to "bring friends & family, posters, bricks, bookbags etc." R. 1 at 5. The "flyer" also stated that "after the mall we hitting the whole PROSPECT & NEIL." *Id.*

The complaint alleges that at approximately 2:36 p.m. on June 1, 2020, a group of approximately 50 to 75 people gathered at Marketplace Mall and at approximately 3:12 p.m. the group began causing property damage and looting stores at the mall. *Id.* According to the complaint, Mr. Betts also posted a video to his Facebook live during the event. *Id.* at 4. The government alleges that the riot involved property damage and looting at Marketplace Mall and other businesses in the area of Marketplace Mall. *Id.*

## II.    Argument

Federal Rule of Criminal Procedure 12(b)(3) allows a party to move to dismiss an indictment prior to trial if the indictment contains a defect. FED. R. CRIM. P. 12(b)(3). To address this motion, the Court first looks to the Sixth Amendment to the Constitution, which sets out that criminal defendants "shall enjoy . . . the right to be informed of the

---

[1] The complaint alleges that the poster specifically stated 3 p.m. R. 1 at 5. This is incorrect. The poster only lists the number 3. It makes no mention of "a.m." or "p.m." R. 1 at 8, Exhibit B.

2

nature and cause of the accusation." U.S. Const. amend. VI. A motion to dismiss an indictment does not challenge the strength of the government's case or the sufficiency of the evidence. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). Rather, when ruling on a motion to dismiss, the Court must determine "whether it's possible to view the conduct alleged" as constituting the crime charged. *Id.*

Here, the indictment is defective because the Federal Anti-Riot Act, 18 U.S.C. § 2101, is unconstitutional on its face. The Act criminalizes protected speech under the First Amendment, rendering it unconstitutionally overbroad. Additionally, the Act is unconstitutionally void-for-vagueness. Finally, notwithstanding the facial overbreadth, the Act is unconstitutional as applied to Mr. Betts in this case. As such, the indictment must be dismissed.

### A.  The Federal Anti-Riot Act

Passed in response to civil unrest in the 1960s, the Anti-Riot Act is a barely-used and largely undefined statute that doesn't criminalize riots. Instead, it prohibits traveling in or using a facility of interstate commerce with the intent to, at some unspecified later time, incite, organize, promote, encourage, participate in, carry on, or commit violence in furtherance of a riot, or to aid and abet someone else in doing some of these things. To be convicted, a defendant must also, at the time of his travel or use or any time after, perform or attempt any other overt act for one of these purposes. The penalty is up to five years in prison.

Pursuant to 18 U.S.C. § 2101:

> Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—

(1)  to incite a riot; or

(2)  to organize, promote, encourage, participate in, or carry on a riot; or

(3)  to commit any act of violence in furtherance of a riot; or

(4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;

and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph [(1), (2), (3), or (4)] of this paragraph—

Shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 2101(a).

Accordingly, the Anti-Riot Act has two elements: (1) travel or use of interstate commerce with a certain intent and (2) an overt act for a certain purpose. Notably, the Anti-Riot Act covers far more than acts of violence. It also criminalizes activities that precede any violence, so long as the individual acts with the required purpose or intent. And, importantly, the Anti-Riot Act reaches speech and expressive conduct. See *United States v. Dellinger*, 472 F.2d 340, 359 (7th Cir. 1972) (finding the Anti-Riot Act implicates the First Amendment).

The statute further has an express carve-out for travel or use "for the purpose of pursuing the legitimate objectives of organized labor, through orderly and lawful means," *id*. § 2101(e), and **leaves to the States primary jurisdiction over offenses that violate the Act and local law**. *Id*. § 2101(f).

Under § 2102, riots are defined in two ways. First, a "public disturbance" qualifies as a "riot" if it involves

4

> **an act or acts of violence** by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual

18 U.S.C. § 2102(a)(1) (emphasis added to show comparison). Alternatively, a "public disturbance" is a "riot" if it involves:

> **a threat or threats of the commission of an act or acts of violence** by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

*Id.* at (a)(2) (emphasis added to show comparison).

To simplify, the Anti-Riot Act defines "riot" in two ways. A riot is a public disturbance involving acts of violence, committed by at least one person in a group, which results in property damage or personal injury. This first definition coincides with the common understanding of a riot––for instance, individuals overturning police cars and throwing fire bombs into businesses. A riot also includes a public disturbance involving the threat of violence, by persons in a group, so long as at least one person could immediately act upon the threat. This second definition, for example, would apply to a group threatening to light a police car on fire, while the group is standing next to a squad car with a can of gasoline.

The Anti-Riot Act, however, does not just criminalize the behavior of those in the heat of a riot. It also criminalizes acts taken long before any crowd gathers, or acts that have only an attenuated connection to any riot, so long as the individual acts with the required purpose. *See* 18 U.S.C. § 2101(a). No violence even need to occur. A defendant

could be convicted for renting a car with a credit card, posting about a political rally on Facebook, or texting friends about when to meet up.

The Anti-Riot Act offers some clarification as to how far it extends by defining the terms "to incite a riot" and "to organize, promote, encourage, participate in, or carry on a riot." As defined, these terms "include[], but [are] not limited to, urging or instigating other persons to riot." *Id.* § 2102(b). However, they do not include "the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts." *Id.*

Pursuant to this latter clause, a defendant cannot be convicted under the statute if he merely advocates ideas or expresses a belief. The double negative, however, places a significant limit on this exception. Although it is not a crime merely to advocate ideas, it may still be a crime to advocate acts of violence or assert the rightness of, or the right to commit, any such acts.

## B. Judicial Interpretation of the Federal Anti-Riot Act

Between 1968 and 2020, there have been six reported cases that discuss the Anti-Riot Act in any detail, three that are related to the Chicago Seven who were prosecuted for their participation in a protest of the 1968 Democratic National Convention, and one in response to a declaratory judgment action brought by the Black Liberation Movement in 1969. *See United States v. Dellinger,* 472 F.2d 340 (7th Cir. 1972) (overturning convictions of the Chicago Seven while upholding constitutionality of the act 2-1); *Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 938 (7th Cir. 1969) (declaratory judgment about Anti-Riot Act in proceeding related to *Dellinger*); *United States v. Hoffman,*

334 F. Supp. 504, 509 (D.D.C. Nov. 23, 1971) (affirming constitutionality of act in ruling on motion for disclosure of records of electronic surveillance about one member of the Chicago Seven); and *In re Shead*, 302 F. Supp. 560, 565 (N.D. Cal. 1969) (upholding constitutionality of act in declaratory judgment brought by Black Liberation Movement), *aff'd on other grounds* in *Carter v. United States*, 417 F.2d 384 (9th Cir. 1969) (finding plaintiffs had no standing to challenge constitutionality of the law).

However, even all three of the *Dellinger* judges recognized the Act "on [its] face," presented "first amendment problems." *Dellinger*, 472 F.2d at 362. But the majority, acknowledging a "close" case, consciously discarded the plain statutory language in favor of a non-textual interpretation to avoid constitutional concerns. *Id.* at 361-63. The dissent, reading the statute as written, found it "facially unconstitutional" and "clearly violative of the First Amendment." *Id.* at 409-10 (Pell, J., dissenting in part).

Modern decisions, however, have correctly recognized the problems with the Anti-Riot Act. For example, in *United States v Rundo*, No. CR 18-00759-CJC, R. 145 (C.D. Cal. June 3, 2019), the district court correctly found that the Anti-Riot Act was facially overbroad, noting that the Act punishes not only the behavior of those in the heat of a riot, but also acts that have only an attenuated connection to any riot. *Rundo*, No. CR 18-00759-CJC, R. 145 at 6. In fact, as the *Rundo* court noted, to be guilty under the Anti-Riot Act, no violence even need to occur. *Id.* As such, the California District Court found that the Federal Anti-Riot Act unnecessarily and unconstitutionally overbroad.[2] As discussed in greater detail below, the United States Court of Appeals for the Fourth Circuit has also

---

[2] *United States v. Rundo* is currently on appeal before the United States Court of Appeals for the Ninth Circuit and is set for oral argument on November 17, 2020. See *United States v. Rundo*, No. 18-cr-759 (C.D. Cal. June 3, 2019), *appeal docketed*, No. 19-50189 (9th Cir. June 12, 2019).

recently found facial problems with the Act. See *United States v. Miselis*, —F.3d—, 2020 WL 5015072 (4th Cir. Aug. 24, 2020).

Although *Miselis* did not entirely strike down the Federal Anti-Riot Act, it significantly called into question the Seventh Circuit's holding in *Dellinger*. With this backdrop in mind, the Federal Anti-Riot Act is unconstitutional on its face for multiple reasons. The Act is also unconstitutional as applied to Mr. Betts.

### C.  The Federal Anti-Riot Act is Unconstitutionally Overbroad because it Criminalizes a Substantial Amount of Protected Speech and Assembly

The Anti-Riot Act is unconstitutionally overbroad because it regulates Constitutionally-protected speech, and not just in a few hypothetical applications of the statute. In this law, Congress criminalized much more than rioting, and much more than attempting to riot, or even intending to riot. Instead, Congress extended criminal consequences to speech and expression far removed from violence. Numerous sources of vagueness within the statute are set forth below as separate constitutional defects.

Because of the "sensitive nature of protected expression," *New York v. Ferber*, 458 U.S. 747, 768 (1982), "[t]he Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). To implement this protection, the general rules governing facial attacks on statutes are relaxed. Typically, to succeed in a facial attack, a party must establish "that no set of circumstances exists under which [the statute] would be valid, or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal quotation marks and citations omitted).

8

In the First Amendment context, however, a law may be invalidated as overbroad if "it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). This exception is "based on the idea that speakers may be chilled from expressing themselves if overbroad criminal laws are on the books." *See Ferber*, 458 U.S. at 768-69 (citing *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634, 100 S. Ct. 826, 63 L. Ed. 2d 73 (1980)). To combat that chilling effect, even a person whose activity is clearly not protected may challenge a law as overbroad under the First Amendment. *See id.*

In determining whether a statute is overbroad, a court must first construe the statute. *See Williams*, 553 U.S. at 293; see also *United States v. Johnson*, 875 F.3d 360, 366 (7th Cir. 2017) (nothing that it is impossible to determine whether a statute reaches too far without first knowing what the statute covers). After construing the statute, the Court must then ask whether the statute reaches protected speech. *See generally*, *Dellinger*, 472 F.2d at 359 (finding that the federal Anti-Riot Act reaches the First Amendment). Not all speech is protected under the First Amendment. Under the incitement exception to the first amendment, the government may prohibit advocacy of the use of force or of violating the law only "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

## 1. The Anti-Riot Act runs Afoul of *Brandenburg* as it has no Imminence Requirement

The Anti-Riot Act, which predates *Brandenburg*, has no imminence requirement. The Anti-Riot does not require that advocacy be directed toward inciting or producing

9

imminent lawless action. It criminalizes advocacy even where violence or lawless action is not imminent. And in doing so, the Anti-Riot Act "eviscerates *Brandenburg*'s protections of speech." *Rundo*, No. 18-cr-00759, R. 145 at 7.

However, the legislative history shows that the Act was never intended to have *Brandenburg*'s imminence requirement. Rather, as explained by its initial sponsor, the Act's aim was to prevent "professional agitators" **from traveling state to state**, "inflam[ing] the people," and "then leav[ing] the jurisdiction before the riot begins." 13 Cong. Rec. 19,363-64 (statement of Rep. Cramer), https://tinyurl.com/y8w7c95n

> T]he presence of Stokely Carmichael, former head of the so-called Student Nonviolent Coordinating Committee, and now a free-lance insurrectionist, has preceded many of the outbreaks. He works up his audiences to a fever pitch. He tells them they are downtrodden, that "black power" is their salvation, that the Negroes must take the law into their own hands, that they must "kill Whitey," and that they must "burn, baby, burn." . . . .
>
> Carmichael then usually leaves that jurisdiction. In his wake are thousands of Negroes whose blood is simmering—waiting for the instance certain to occur in any large city when a felon is arrested or shot. Charges of police brutality ring out and, like turning up the flame under a cauldron of simmering oil, the boiling point is quickly reached. The riot is underway.

*Id.* at 19,364; *see* Marvin Zalman, *The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory*, 20 Vill. L. Rev. 897, 916 (1975) (explaining Act's "intent" was "to destroy what was believed to be a close-knit group of outside agitators fomenting disorder"), https://tinyurl.com/y9c5polw.

Like the statute considered in *Brandenburg*, the Anti-Riot Act sweeps within its condemnation speech which our Constitution has immunized from government control.

Attempting to curb public disturbances during demonstrations, the Anti-Riot Act engulfs a massive amount of behavior, including mere advocacy of force or violence, and does not require incitement to imminent lawless action.

Indeed, the law lacks any requirement that the regulated expression be constrained to imminent lawless action, or that the expression be likely to incite or produce such action. Instead, the Anti-Riot Act, like the statute at issue in *Brandenburg*, punishes the mere advocacy of violence. Worse still, the law punishes the use of commerce with the intent to merely advocate for violence, whether or not any violence ever occurs. And criminal liability can hinge not on the actions of the speaker, but on how others react— potentially long after the Commerce Event.

In short, the timeframe for the contemplated riot(s) is entirely unbounded, at each step. That is the exact opposite of "imminent." See *Cambridge Dictionary*, https://dictionary.cambridge.org/us/english/imminent (defining imminent as "coming or likely to happen very soon"). But "advocacy of illegal action at some indefinite future time," *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam), be it "weeks or months" later, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982), does not meet *Brandenburg*'s test.

The two-step structure of the Act aside, the actions it proscribes are far removed from incitement. Subsection (a)(2) prohibits travel or use with into to "organize, promote, [or] encourage" a riot. To "organize" a riot is to "to make arrangements for [it] to happen," *Cambridge Dictionary*, https://dictionary.cambridge.org/us/english/organize. To "promote" a riot is "to encourage people to like . . . or support" it. Cambridge

11

Dictionary, https://dictionary.cambridge.org/promote. Neither term suggests imminence.[3]

Likewise, "'encourage' means 'to inspire with courage, spirit, or hope . . . to spur on . . . to give help or patronage to.'" *United States v. He*, 245 F.3d 954, 960 (7th Cir. 2001) (quoting Merriam Webster's Collegiate Dictionary 381 (10th ed. 1996)). The Supreme Court has long distinguished encouragement from incitement. *See Free Speech Coalition*, 535 U.S. at 253-54 (holding "Government may not prohibit speech on the ground that it may encourage [others] to engage in illegal conduct"); see also *Nat'l Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270, 1274 (10th Cir. 1984) ("'Encouraging' and 'promoting,' like 'advocating,' do not necessarily imply incitement to imminent action."); *Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 884 (D.S.D. 2019) (holding "encourage" connotes "expressive activity that is protected speech").

Even subsection (a)(1), criminalizing travel or use with intent "to incite a riot," runs afoul of *Brandenburg*'s incitement exception. Though the term "incite" could, theoretically, provide temporal limitations, it plainly doesn't in this Act, where Congress gave it a broader meaning. Specifically, the statute defines "the term 'to incite a riot'" as including, but not limited to, "urging or instigating other persons to riot." 18 U.S.C. § 2102(b). To "urge" is "to strongly advise or try to persuade someone to do a particular thing." *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/urge. To "instigate" is "to cause an event or situation to happen by making a set of actions or a formal process

---

[3] The Fourth Circuit disagreed with this interpretation of "organize" in *Miselis*. As discussed in greater detail below, the Fourth Circuit's definition or organize cannot be reconciled with the entire statute.

begin." *Cambridge Dictionary*,

https://dictionary.cambridge.org/us/dictionary/english/instigate. Neither demands

imminence. See *United States v. Sineneng-Smith*, 910 F.3d 461, 483 (9th Cir. 2018) (vacated

and remanded on other grounds by *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020))

(using "urge" as example of protected speech).

Congress eliminated any doubt the Act criminalizes "advocating violent means to

effect political and economic change" when it defined inciting, organizing, promoting,

participating, and carrying on a riot in Section 2102. *Brandenburg*, 395 U.S. at 447. Those

terms "shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2)

expression of belief, not involving advocacy of any act or acts of violence or assertion of

the rightness of, or the right to commit, any such act or acts." 18 U.S.C. § 2102(b). Though

this language may be "clumsy," the implication of the double negative is clear: "Although

it is not a crime merely to advocate ideas, it may still be a crime to advocate acts of

violence or assert the rightness of, or the right to commit, any such acts." See *Dellinger*,

472 F.2d at 411-13 (Pell, J., dissenting) (discussing how legislative history supports this

reading); see also *Miselis*, -- F.3d --, 2020 WL 5015072 at *13.

None of this is surprising. Congress wasn't aware of *Brandenburg*'s test when it

passed the Anti-Riot Act one year earlier. Maybe Congress would draft the statute

differently today, but as written it requires only "a remote connection between speech

that might encourage" rioting "and any resulting" criminal activity. *Free Speech Coalition*,

535 U.S. at 253. That is unconstitutional.

**2.   The Act proscribes expression that does not rise to the level of a "true threat"**

The Act also criminalizes travel or use with intent to incite, organize, promote, encourage, participate in, or carry on "a public disturbance involving . . . a threat or threats" of "violence" by at least one person in a group having "the ability of immediate execution of such threat or threats, where the performance of the threatened . . . violence would constitute a clear and present danger of, or would result in, damage or injury to the property [or] person" of another. 18 U.S.C. § 2102(b). In this way, it also punishes protected expression because threatening speech is constitutional unless it is a "true threat." *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969).

A statement is not a "true threat" unless the speaker subjectively intends to threaten. *See Virginia v. Black*, 538 U.S. 343, 359 (2003). Nor is it a "true threat" unless it threatens "violence to a particular individual or group of individuals," i.e., places "the victim in fear of bodily harm or death." *Id.* at 359-60. The Anti-Riot Act fails both of these tests; it requires no subjective intent, and it criminalizes threats of damage to property.

### 3.  The Act Creates an Impermissible "Heckler's Veto"

Finally, the Anti-Riot Act criminalizes otherwise-lawful speech and assembly based on anticipated violent or threatening listener reactions, counter to the longstanding prohibition on a "heckler's veto."

The source of the problem is § 2102, which defines "riot" expansively to include all public, group disturbances where someone acts violently or threateningly. 18 U.S.C. § 2102(a). A defendant who travels interstate intending to participate in, and does participate in, a "riot" is guilty of violating the Act—even if her conduct is entirely peaceful. The defendant need not engage in or precipitate violent or threatening conduct.

14

She need only recognize the event will involve at least one bad actor who will commit such acts.

In this way, the statute violates the heckler's veto line of cases. See *Michael v. City of Granite City*, 2006 U.S. Dist. LEXIS 62163, *12 (S.D. Ill. 2006) (collecting cases). That doctrine applies where the state prevents a speaker from exercising his constitutional rights because of the reaction to him by others. *Id.* Notably, "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Id.* (citing *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323, 122 S. Ct. 775, 151 L. Ed. 2d 783 (2002)). Clearly, a state may not keep law and order by depriving its citizens of their rights. *Id.* (citing *Cooper v. Aaron*, 358 U.S. 1, 16, 78 S. Ct. 1401, 3 L. Ed. 2d 5, 79 Ohio Law Abs. 452 (1958)). See also *Gregory v. Chi.*, 394 U.S. 111, 117, 89 S. Ct. 946, 22 L. Ed. 2d 134 (1969) (disorderly conduct conviction cannot stand when defendant acted in an orderly manner but surrounding crowd became hostile).

Nor does the Act's "intent" requirement solve the problem because a defendant doesn't need to intend violence or threats; she need only intend to participate in an event where she knows someone will engage in those acts. See *Dellinger*, 472 F.2d at 359 ("In many of its provisions (incite, organize, promote, encourage) the anti-riot statute relates to persons causing the possibility that others will riot, and makes those persons liable because of their causal rather than active role.").

Anyone may threaten to assault demonstrators at an upcoming event. Participants then risk criminal liability if they attend. The Act thus places enormous power in the hands of hostile audiences to disrupt or prevent demonstrations they disapprove of, and

denies unpopular groups the right to lawfully assemble whenever there is determined opposition.

An example drawn from the Supreme Court's decision in *Forsyth County* illustrates the problem. Civil rights activists staged a rally in Georgia, but the Ku Klux Klan disrupted the event "by throwing rocks and beer bottles." Well aware the Klan would respond in like fashion, the demonstrators returned the following weekend to march again. As expected, counter-protestors turned violent. Under the Anti-Riot Act, the civil rights marchers—among them U.S. Senators and Presidential candidates—could be punished because they intended to, and did, participate in a "riot," as the Act defines it. *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 125-26 (1992).

Because the Anti-Riot Act requires defendants to censor their speech based on potential listener reactions, it violates the heckler's veto doctrine and is a dangerous tool to be levied against unpopular groups.

### D. The Anti-Riot Act Criminalizes a substantial amount of expression compared to its legitimate sweep

When an overbroad statute regulates conduct in addition to speech, courts must strike it down if the overbreadth is "substantial" when "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 600, 615 (1973); see also *Free Speech Coalition*, 535 U.S. at 244 (A statute "is unconstitutional on its face if it prohibits a substantial amount of protected expression.").

As described above, by "proscrib[ing] a significant universe of speech" and assembly that fall outside the incitement and true threats exceptions and depend on listener reaction, *Free Speech Coalition*, 535 U.S. at 240, the Anti-Riot Act criminalizes a

16

substantial amount of protected expression "in an absolute sense." *Williams*, 553 U.S. at 292. In today's world, where facilities of interstate commerce—cell phones—are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy," the potential for the Act to punish everyday expression is undeniable. *Riley v. California*, 573 U.S. 373, 386 (2014).

It does not take "fanciful hypotheticals" to envision how the Act punishes lawful speech and assembly. *Williams*, 553 U.S. at 301. One need look no further than the Supreme Court's seminal incitement case to find an example of protected expression that would now be criminal.

In *Brandenburg*, a Ku Klux Klan leader used the telephone to invite others to a rally where attendees carried firearms and burned a cross while threatening violence against "niggers" and "Jews." At the rally, the defendant spoke of taking "revengeance" at upcoming Klan marches. *Brandenburg*, 395 U.S. at 445-46 & n.1. This expression, held protected by the Court, would subject Brandenburg to up to five years in prison under the Act.

Indeed, the Act historically has been used to criminalize political expression. The Chicago Seven prosecution, at issue in *Dellinger* (as discussed in greater detail below), was "based wholly on the making of speeches." *Dellinger*, 472 F.2d at 359. In the Ninth Circuit, federal agents brought charges against a group who traveled interstate "in possession of a truck filled with food, blankets and other life-support materials . . . with an intent to transport these materials to Wounded Knee for the benefit of those engaged in the uprising." *Burgwin v. Mattson*, 522 F.2d 1213, 1213 (9th Cir. 1975). And in this case,

17

rather than leave prosecution for acts of violence to the State (18 U.S.C. § 2101(f)), the federal government charged Mr. Betts predicated on a Facebook post.

Any argument by the government that prosecutors can be trusted not to bring charges in cases of such obvious First Amendment exercise is belied by this case as well as the statements made by the Attorney General himself. See *Attorney General William P. Barr's Statement on the Death of George Floyd and Riots*, U.S. Dep't of Justice (May 30, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barr-s-statement-death-george-floyd-and-riots ("[I]t is a federal crime to cross state lines or to use interstate facilities to incite or participate in violent rioting. We will enforce these laws.").

In addition to its absolute overbreadth, the Act is overbroad in "relative" terms, *Williams*, 553 U.S. at 292, because its legitimate sweep covers nothing more than violent conduct already proscribed by Congress or traditionally left to the States. *See, e.g.*, 18 U.S.C. §§ 113 (assault), 231 (civil disorder), 249 (hate crime), 1361 (destruction of property); 720 ILCS 5/25-1 (mob action, which includes assembling with the intent to commit a felony), 720 ILCS 5/16-1 (theft), 720 ILCS 5/21-1 (criminal damage to property). The government does not need the constitutional residue of the Act. Law enforcement has its pick of statutes to employ against violent riots.

### E.  *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972)

Nearly 50 years ago, the Seventh Circuit became the first appellate court to analyze the constitutionality of the Federal Anti-Riot Act through the lens of anti-Vietnam War protests. The defendants in *Dellinger* traveled to Chicago from other states and made anti-war speeches on various dates in August of 1972. *Dellinger*, 472 F.3d at 349-50. These speeches led to the defendants being charged under the Anti-Riot Act with traveling from

18

outside of Illinois "with intent to incite, organize, promote and encourage a riot, and thereafter, on or about specified dates and at specified locations, with speaking to an assemblage of persons for the purposes of inciting, organizing, promoting and encouraging a riot." *Id.* at 350. In short, as *Dellinger* shows, 50 years ago the statute was concerned with people who did not live in their own state, traveling to other states to incite violence.

   1.  **The *Dellinger* majority opinion**

   The *Dellinger* defendants argued that the Federal Anti-Riot Act was unconstitutional on its face. The Seventh Circuit started with the basic notion that every statute must give notice as to what conduct is prohibited, but that a statute's warning "may extend too far – it may describe and give warning regarding conduct which cannot be constitutionally penalized." *Id.* at 355. The Court noted that in the instances where statutes "clearly warn that constitutionally protected expressive activity *will be*, or even, with some degree of vagueness, warn that such activity may be penalized, the courts have recognized a 'chilling effect,' or deterrence of protected expression which requires more drastic judicial treatment of the statute." *Id.* (emphasis in original).

   The Court also noted that there is no requirement that the person attacking the statute demonstrate that his own conduct could not be constitutionally regulated, and that in a case where "no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution . . ., the whole statute must be declared a violation of the first amendment, and void for all applications." *Id.* at 356.

   As the Court addressed, "the doctrine of overbreadth applies when a statute lends itself to a substantial number of impermissible applications, such that it is capable of

deterring protected conduct, when the area affected by the challenged law substantially

involves first amendment interests, and when there is not a valid construction which

avoids abridgment of first amendment interests." *Id.* at 357.

The Court then analyzed the Act itself before noting that "[w]e view the statutory

element of interstate travel (or use of facilities), accompanied by the specified intent, as an

element which Congress required as the foundation for its power to punish the conduct

of inciting or participating in a riot." *Id.* at 359. The Court found that rioting, in history

and by nature, "almost invariably occurs as an expression of political, social, or economic

reactions, if not ideas." *Id.*

In relation to the actual language of the Act, the Court pointed out that "[i]n many

of its provisions (incite, organize, promote, encourage) the anti-riot statute relates to

persons causing the possibility that others will riot, and makes those persons liable

because of their causal rather than active role." *Id.* Importantly, the Court then stated that

in order to remove expression from the protection of the First Amendment, the removed

expression "must have some very substantial capacity to propel action, or some similarly

entwining relationship with it." *Id.* The Court noted that "[t]his requirement is at the heart

of the clear and present danger test enunciated by Mr. Justice Brandeis in *Whitney v.*

*California.*" *Id.* Citing to *Brandenburg v. Ohio*, 24 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d

430 (1969), the Court stated that before advocacy of the use of force of law violation can be

proscribed it must be shown (1) that such advocacy is directed to inciting or producing

imminent lawless action and (2) that such advocacy is likely to incite or produce such

action." *Id.* at 360. Accordingly, "[t]he real question is whether particular speech is

20

intended to and has such capacity to propel action that it is reasonable to treat such speech as action." *Id.*

With this in mind, the *Dellinger* Court framed the facial validity question as whether the Federal Anti-Riot Act, as properly construed, "punishes speech only when a sufficiently close relationship between such speech and violent action found to exist." *Id.* Using this formula, the Court first determined that the statute adequately described a "riot" in § 2102(a). *Id.* at 360-61. The Court, however, expressly noted that there is no requirement in §§ 2101 and 2102 that the riot defined in § 2102(a) occur. *Id.* at 361. Because of this, the Court noted that the question is "whether one could ever be convicted under the statute, reasonably construed, for a speech which fulfilled one of [the elements in § 2101(a)(1)] without being sufficiently closely related as propelling cause of a riot." *Id.* at 361.

The Court held that "**all the elements of [§ 2101(a)(1)] (A) and (B) are treated alike in § 2102(b)**, and each includes but is not limited to, urging, or instigating other persons to riot." *Id.* (emphasis added). Accordingly, the Court found that "all terms are on equal footing with respect to the degree of casual relationship required." *Id.* Thus, the Court held that the "threshold definition of all categories as 'urging or instigating' puts a sufficient gloss of propulsion on the expression described that it can be carved away from the comprehensive protection of the first amendment's guarantee of freedom of speech." *Id.*

However, the Court also expressly stated the following:

> If we could be persuaded that the overt act "for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph" could be a speech which only was a step toward one of the elements of (A)-(D), taking those

21

merely as goals, we would be unable to conclude that the statute required
an adequate relation between such speech and action.

*Id.*

Despite finding that the statute was not facially overbroad, the Court stated that it

did "not pretend to minimize the first amendment problems presented on the face of this

statute." As the Court correctly stated:

Arguably the statute does not require that the speech, if made, or the
handbill, if circulated, succeed in any substantial degree in encouraging the
audience to riot. Arguably a frustrated attempt to speak or circulate would
not achieve the constitutionally essential relationship with action in any
event.

*Id.* at 362. Although the Court, at the time, rejected the arguments, the Court noted that

"the case is close." *Id.* Finally, the Court rejected the argument that the "double negative"

in § 2102(b) punished only the mere oral or written advocacy of an act of violence or

assertion of the rightness of an action of violence. *Id.* at 364.

**2.  The *Dellinger* Dissent**

*Dellinger* was a 2-1 decision with Justice Pell issuing a lengthy dissent on the issue

of the facial validity of the Anti-Riot Act. The dissent pointed out that § 2102(b)'s "double

negative" was "the determinative step leading to and through the gateway of First

Amendment violations." *Dellinger*, 472 F.2d at 412 (Pell, J., dissenting). This is because the

double negative creates a situation where someone who merely advocates violence (a

protected activity), "will be caught in the same net as the true inciter." *Id.* Thus, the

dissent found that "the added phrase was intended to preclude, under plain of

prosecution, advocacy of violence even though only an idea or expression of belief." *Id.* at

413.

Citing to *Brandenburg*, the dissent noted that a statute which fails to draw the distinction between the advocacy of violence in the abstract and the advocacy of violence that is directed to producing imminent lawless action "impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments." *Id.* The dissent went on to state that:

> The fault of the statute here when reread in the light of the teaching of Brandenburg is that the purported speaker who travels in, or uses the facilities of, interstate or foreign commerce is not provided with the specifically drawn line between protected and violative utterances.

*Id.*

As the dissent correctly pointed out, the different meanings of the word "urge" in the dictionary provides simultaneously a basis for both prosecution and a defense to the prosecution. *Id.* Moreover, the statute as written allows someone who merely goes beyond the bare statement that violence is right to correct an abuse and states that it is "imperative," then the individual has "urged" violence without any direct connection to action. *Id.* at 414.

The dissent expressly found that the statute, as written, fails to meet *Brandenburg*'s requirement that advocacy is unprotected only where it is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. *Id.* at 414. More specifically, the dissent pointed out that there is no causal relationship between the interstate act and the riot actually incited. Importantly, not only is there no causal relationship, but there is no "time limitation as to when the overt act shall take place with relationship" to the interstate act. *Id.* As the dissent observed:

> I cannot conceive the constitutional validity of a statute which in this open-ended manner punishes a person at the federal level for what would

23

otherwise be a local crime only because at some time in his past he had
crossed a state line or had used a facility of interstate commerce with a
nefarious intent.

*Id.*

### 3.   The Impact of *Dellinger* on this Case

Although it is 50 years old and has been called into question, *Dellinger* has yet to be

overturned by the Seventh Circuit—most likely due to the dearth of Anti-Riot Act

prosecutions. As such, the government will argue that the case is controlling and that this

Court lacks the authority to declare the Federal Anti-Riot Act unconstitutional. To the

extent that this is true, Mr. Betts wishes to preserve his arguments pertaining to

overbreadth for appeal. However, Mr. Betts believes that significant intervening case law

has rendered *Dellinger* inapplicable so that the overbreadth challenge is not foreclosed.

Additionally, Mr. Betts's vagueness and "as applied" challenges to the Anti-Riot Act were

not foreclosed by *Dellinger* and therefore are appropriately before this Court regardless of

any decision on overbreadth.

First, this Court is not bound by *Dellinger* because it is not clear that *Dellinger*

adequately and appropriately applied the Supreme Court's standard announced in

*Brandenburg*. While lower courts are usually reluctant to find that subsequent decisions

have implicitly overruled controlling precedent, if events subsequent to the last decision

by the higher court make it almost certain that the higher court would "repudiate the

doctrine if given a chance to do so, the lower court is not required to adhere to the

doctrine." *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986)

(citations omitted); *see also United States v. Burke*, 781 F.2d 1234, 1239 n.2 (7th Cir. 1985)

(noting that a lower court need not "blindly follow" decisions that have been undercut by subsequent cases).

As pointed out in great detail below, subsequent decisions, mainly the Fourth Circuit's decision in *United States v. Miselis*, — F.3d —, 2020 WL 5015072 (4th Cir. Aug. 24, 2020), have called into question whether *Dellinger* would be upheld and applied today. Moreover, it is clear that the ability for speech to be so easily broadcast across the internet and social media was not a factor when *Dellinger* was decided 50 years ago. It is highly unlikely that the outcome in *Dellinger* would be the same today considering the subsequent developments in both the law and technology since the Vietnam-war era.

More importantly, *Brandenburg* was in its infancy at the time *Dellinger* was decided in 1972. The *Dellinger* opinion shows that the principles of *Brandenburg* had yet to be adequately developed and considered at the time *Dellinger* was issued. *Dellinger*, while mentioning *Brandenburg*, also makes reference to the abrogated "clear and present danger" test that had been announced in *United States v. Whitney*. See *Dellinger*, 472 F.3d at 359. As such, there is no indication that *Brandenburg*'s test was adequately adopted and applied in *Dellinger*.

Moreover, it is clear that the *Dellinger* majority undertook an impermissible effort to rewrite the statute in order to save what the majority described as first amendment problems "on the face" of the statute. *Id.* at 362. Despite acknowledging that it was a "close case" as to whether the Act was overbroad, the *Dellinger* majority consciously discarded the plain statutory language in favor of a non-textual interpretation to avoid constitutional concerns. *Id.* at 361-63. The dissent, reading the statute as written, found it

"facially unconstitutional" and "clearly violative of the First Amendment." *Id.* at 409-10 (Pell, J., dissenting in part).

Rather than avoid the problem that the Act turns every riot in the country into a federal offense, *Dellinger* rewrote the statute to require that "the details of the riot contemplated at the time of travel" and those at "the time of the overt act . . . be sufficiently similar so that it is reasonable to say the latter is the same as or the evolving product of the one intended earlier." *Dellinger*, 472 F.2d at 393-94. And the Seventh Circuit did so consciously, and in recognition that without this redrafting of the statute, the law would not survive an overbreadth challenge. *Id.* at 362 ("If we could be persuaded that the overt act…could be a speech which only was a step toward one of the elements of (A)-(D), taking those merely as goals, we would be unable to conclude that the statute required an adequate relation between such speech and actions").

But that isn't what the Act says. As the *Dellinger* dissent explained, Congress included no "causal relationship between the travel with intent and the riot actually incited. No necessary connection whatsoever need be shown between them nor is there any time limitation as to when the overt act shall take place with relationship to the travel." *Dellinger*, 472 F.2d at 414 (Pell, J., dissenting). This Court should read the statute as it is actually drafted and need not give effect to language that is not a part of the Act.

The Anti-Riot Act thus "punishes a person at the federal level for what would otherwise be a local crime only because at some time in his past he had crossed a state line or had used a facility of interstate commerce with a nefarious intent." *Id.* This broad authority entrusts in the executive enormous, potentially-dangerous power. See *Zalman*, *supra*, at 920-21. And it strips the statute of its moral force, for it is unity of *mens rea* and

*actus reus* that allows our criminal courts to assess culpability and dispense proportionate punishment. See *Morissette v. United States*, 342 U.S. 246, 250-56 (1952); see also 18 U.S.C. § 2101(f) (leaving jurisdiction to the states based on the same conduct that the Act is designed to punish).

Additionally, *Dellinger* itself acknowledges that someone like Mr. Betts does not need to intend violence or threats—he need only intend to participate in an event where he knows someone will engage in those acts. See *Dellinger*, 472 F.2d at 359 ("In many of its provisions (incite, organize, promote, encourage) the anti-riot statute relates to persons causing the possibility that others will riot, and makes those persons liable because of their causal rather than active role."). *Dellinger* acknowledges that no criminal act is even required to violate the statute. *Id.* at 361 (explaining statute has "no requirement" riot ever occur).

*Dellinger* recognizes that Congress lacks the power to punish someone who travels in interstate commerce merely because he has the intention of committing an illegal act at the conclusion of the journey (*Id.* at 358-359), yet it upholds a law that does not require any time relation between acting with intent to cause one of the outcomes in § 2101 and the overt act that is also required to complete those purposes.

All of these flaws show that *Dellinger* has been severely undercut to the point where the Court is no longer bound to follow its reasoning. In the 50 years since *Dellinger* was decided, *Brandenburg* has developed and technology has advanced to the point where someone may be charged with inciting a riot without ever leaving their own living room. The validity of *Dellinger* is seriously in question today and, when given the chance to do

so, it is highly likely that the Seventh Circuit would no longer adhere to the outdated and often questioned precedent.

Finally, the argument that the Act is unconstitutionally vague is not foreclosed by *Dellinger*. Although *Dellinger* makes reference to vagueness in the context of overbreadth (472 F.2d at 357) the decision does not foreclose an independent challenge that the statute is unconstitutionally vague in that it does not require a riot, fails to properly define a riot, contains the unconstitutionally vague terms of incite, organize, promote, and encourage, and a fails to provide a connection between its two elements. These arguments, addressed below, are never addressed by (and therefore not foreclosed by) *Dellinger*.

### F. *United States v. Miselis*, — F.3d —, 2020 WL 5015072 (4th Cir. Aug. 24, 2020)

On August 24, 2020, the United States Court of Appeals for the Fourth Circuit issued an opinion striking down the Federal Anti-Riot Act in part. The Fourth Circuit, in holding that the statute was partially overbroad on its face, noted that while the terms "incite" and "organize" under § 2101(a)(1) do not reach protected speech under the First Amendment, the terms "encourage" and "promote" do reach protected speech because they relate to only "abstract advocacy." *United States v. Miselis*, -- F.3d --, 2020 WL 5015072, *10-*12 (4th Cir. Aug. 24, 2020). Looking to § 2101(b), the *Miselis* court also found that while "instigating" others to riot is not protected speech, "urging" others to riot is indeed protected speech as well. *Id.* at *12.

Moreover, the court also found the "double negative" contained in the second clause of § 2102(b) problematic. As the court noted, the double negative actually makes the phrase mean that the purposes of inciting a riot "shall . . . be deemed to mean the mere . . . advocacy of any act or acts of violence or assertion of the rightness of, or the

right to commit, any such act or acts." *Id.* at 13 (emphasis in original). However, despite the substantial overbreadth issues on the face of the Anti-Riot Act, the Fourth Circuit ultimately held that the offending provisions could be severed away, saving the portions of the Act that did not offend the First Amendment. *Id.* at *15-*17. Finally, the court found that the statute was not unconstitutionally vague. *Id.* at *17-*19.

The Fourth Circuit's opinion, while a step in the right direction away from *Dellinger*, still neglects to adequately recognize that the entire statute is overbroad. Moreover, even if *Miselis* is correct that only portions of the statute are overbroad, the Fourth Circuit incorrectly held that the offending portions of the statute may be severed away to save the Act. Finally, even if the Fourth Circuit's opinion is entirely correct, Mr. Betts's conduct falls within the portions of the Act that were held unconstitutional.

## 1. There is no meaningful distinction between the portions of the Act that *Miselis* held constitutional and unconstitutional

The Fourth Circuit's opinion attempts to parse out the differences between the words "incite," "organize," and "instigate" and "encourage" "promote" and "urge," to find the latter set of words to constitute protected speech while finding the former set to be unprotected speech under *Brandenburg*. *Miselis*, -- F.3d --, 2020 WL 5015072 at *10-*12. These distinctions are without merit and treat language differently than what Congress intended. In fact, even the Seventh Circuit in *Dellinger* noted that "all the elements of [§ 2101(a)(1)] (A) and (B) are treated alike in § 2102(b)." 472 F.2d at 361.

*Miselis* states that the words "incite" and "instigate" are essentially the same thing – words that are likely to produce imminent lawlessness. *Id.* The Court then goes on to

29

hold that "organization" is treated the same way as "incite" and "instigate" under the statute. *Id.* at *11.

Yet, organizing, under the Fourth Circuit's own definition, does not imply imminence. According to *Miselis*, organization means to "oversee the coordination of the various aspects of something" or to "arrange the components of something in a way that creates a particular structure." *Id.* at *11. *Miselis* notes that examples of organization include communicating with prospective participants about logistics, arranging travel accommodations, and overseeing efforts to obtain weapons needed to carry out violence. *Id.* Nowhere in the Fourth Circuit's definition of "organize" does it require any violence to be imminent as required by *Brandenburg*.

In fact, the Court need not look any further than the Central District of Illinois to show that "organizing" involves preliminary discussion of hypothetical riots and still leads to being charged under the Anti-Riot Act. See *United States v. Gibson*, No. 20-cr-11041 (C.D. Ill. Jun. 4, 2020) (§ 2101 charge for encouraging looting as a response to police violence, and unsuccessfully attempting to organize). Thus, the Fourth Circuit's distinction between organize and incite cannot hold up when analyzed under *Brandenburg* because there is no imminence requirement. The distinction the Fourth Circuit attempts to make between words in the same section of the Act does not work.

Moreover, the court makes a distinction between "organize" which coordinates aspects of something and "promote" which "supports or encourages" something by "further[ing] something by helping to introduce it." So, an individual who furthers or advances a "riot" by helping with logistics could easily be said to be "promoting" a riot

30

through advancing or furthering it or "organizing" a riot by dealing with logistics. The former is protected speech, while the latter is not.

The same problem exists when one compares "incite" to "encourage." Incite means speech directly towards producing imminent lawlessness whereas encouragement is speech that attempts to persuade someone to do something. *Id.* at *10. But what if someone attempts to persuade someone do something that will produce imminent lawlessness? Has that person incited or encouraged? The Fourth Circuit's reasoning fails to answer this question.

Moreover, in defining "encourage" the Fourth Circuit notes that "encourage" encompasses all efforts to advocate for a riot, including incitement, but then draws no distinction between where encouragement ends and incitement (or instigation or organization) begins. *Id.* The "carve out" by the Fourth Circuit fails to adequately explain what happens when someone encourages imminent lawlessness or when someone goes from encouragement to incitement. Again, this is why the statute is unconstitutional in all aspects and the Fourth Circuit's attempt at picking the Congressional language apart to try and save the Act simply fails.

The Fourth Circuit's interpretation of the Act is impossible to reconcile with the Act's language when it creates a situation where someone's conduct could fall under both a constitutional and unconstitutional portion of the Act. This is why picking and choosing words that are constitutional and ones that are not does not fix the facial problems with the statute – conduct can fall under multiple definitions. Although the Fourth Circuit takes a step in the right direction by recognizing the constitutional problems with the Act, *Miselis* does not go far enough. The entire Act is facially unconstitutional and the

31

distinctions drawn by the Fourth Circuit do not remedy the serious constitutional problems found on the face of the Federal Anti-Riot Act.

### 2. *Miselis* incorrectly holds that severance can save this statute

Even if the distinctions made by the Fourth Circuit can somehow be accepted, severance cannot save this statute. Some statutes' constitutional problems can be fixed by severing the offending provisions. Despite the Fourth Circuit's opinion in *Miselis*, this is not one of them. The definitions in Section 2102, criminalizing speech that isn't incitement or a true threat, based on listener reaction, infect the entire legislation. See *Allen v. Louisiana*, 103 U.S. 80, 83 (1880) (allowing severance "if the [constitutional and unconstitutional] parts are wholly independent of each other"). And the Fourth Circuit's proposed solution—sever the words "encourage," "promote" and "urging" under §§ 2101(a)(2) and 2101(b), as well as the final phrase of § 2102(b) beginning with the words "not involving" and continuing through the end of that provision--fails to address the true threats and heckler's veto problems and guts half the Act.

Moreover, *Miselis* believed severance was appropriate, relying heavily on the three-judge-plurality in *Barr v. Am. Assoc. Political Consultants*, 140 S. Ct. 2335 (2020). But *Barr* interpreted a statute with a severability clause--a "straightforward analysis" requiring only adherence to the statutory text--in a statute that had functioned well without the unconstitutional amendment for decades. *Id.* at 2349. The presumption of severability that applies in the absence of a severance clause can be rebutted by contrary congressional intent, *Alaska Airlines v. Brock*, 480 U.S. 678, 685 (1987)--where ascertainable, *Barr*, 140 S. Ct. at 2350.

32

*Miselis* presumed Congress would prefer some law to none, but its redline (*Miselis*, --- F.3d ----2020 WL 5015072 at \*16) amounts to a different law that largely targets *intrastate* mid-riot violence. Congress believed that was the state's domain; its aim was the "professional agitator" long gone before the riot started. 112 Cong. Rec. 17659, 17665; see also 18 U.S.C. § 2101(f). And even that assumes *Miselis* got the interpretation of the statute right. *Id.* at \*17 (severance "might prove difficult" otherwise). It did not.

Congress passed the Anti-Riot Act to prevent antecedent speech, not mid-riot conduct. See *Zalman*, supra, at 910 ("[T]he legislative history of the Federal Anti-Riot Act [shows it was] designed not to quell riots, against which there were adequate state laws, but to discourage legitimate political dissent."). As one supporter explained,

> A Federal law is needed. The issue is whether the States and cities should be obliged to wait until a riot breaks out. The Federal Government should step in to investigate the plots and conspiracies when groups meet to select target cities for demonstrations which inevitably lead to outbursts of violence.

113 Cong. Rec. 19,351 (1967) (statement of Rep. Sikes). Congress expressly reserved jurisdiction over conduct that simultaneously violated the Act and local laws to local authorities. 18 U.S.C. § 2101(f). It would make a mockery of federalism to leave behind a statute proscribing nothing more than assault and vandalism, quintessentially local crimes Congress left to the States. See *Bond v. United States*, 572 U.S. 844, 858 (2014) ("Perhaps the clearest example of traditional state authority is the punishment of local criminal activity.").

"The inquiry into whether a statute is severable is essentially an inquiry into legislative intent," and the Fourth Circuit's proposal is not true to that intent. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). Because "it is evident that the

legislature would not have enacted those provisions which are within its power, independently of that which is not," severance is an improper remedy in this case. *Id.* at 191 (internal quotation marks omitted).

### 3. Even if *Miselis* is correct Mr. Betts's conduct falls under the unconstitutional portions of the statute

Even if this Court follows *Miselis* and holds that only "encouraging" and "promoting" as well as "urging" others to riot is overbroad, these are the provisions under which Mr. Betts's conduct falls.

As noted, *Miselis* defines "encouragement" as an "attempt to persuade (someone) to do something." *Miselis*, --- F.3d ----2020 WL 5015072 at *10. This is precisely what Mr. Betts did. He "attempted to persuade" people to show up at the market place at 3 with various items and individuals. R. 1 at 5. In other words, he "encouraged" people to riot.

Maybe even more closely related, Mr. Betts was "promoting" a riot as that term is defined by the Fourth Circuit. According to *Miselis*, "promoting" a riot means "to support or encourage something" or "to advance" or "further something by helping to . . . introduce it." *Id.* at *11. Aside from the obvious problems associated with the Fourth Circuit defining "promote" by using the word "encourage" (which, according to Congress is an entirely different definition in the statute), this definition is precisely in line with Mr. Betts's conduct.

The poster shows that Mr. Betts attempted to "advance" or "further" action by helping to introduce it. He picked the time and the location and then, in the actual Facebook post, stated that he was only the messenger. R. 1 at 5. Mr. Betts is the one who help introduce this action and "supported and encouraged" it.

34

Mr. Betts's conduct also falls comfortably within the overbroad definition of "urging" others to riot. As defined by *Miselis*, to "urge" means to "encourage, advocate, recommend, or advise . . . earnestly and with persistence." *Id.* at *12. Again, this is what Mr. Betts did. He recommended and advised others to show up at Marketplace Mall at a certain time on a certain date. Thus, the online poster made by Shamar Betts falls directly into the categories that the Fourth Circuit has held to be overbroad.

To the extent that the government might argue that Mr. Betts "organized" a riot as "organize" is defied by the Fourth Circuit, this argument is incorrect. As noted, organization means to "oversee the coordination of the various aspects of something" or to "arrange the components of something in a way that creates a particular structure." *Id.* at *11. According to the Fourth Circuit, examples of organization include communicating with prospective participants about logistics, arranging travel accommodations, and overseeing efforts to obtain weapons needed to carry out violence. *Id.*

Mr. Betts did none of the things that constitute "organization." The government has produced no evidence that Mr. Betts communicated with any prospect participants, much less communicated with them about any logistics. The evidence in this case is that led to Mr. Betts being charged is that he posted a message on Facebook "encouraging" people to show up at the Marketplace Mall. He did not communicate with any prospective participants about logistics, he made no travel arrangements for any individuals, and there is no evidence that he oversaw any efforts to obtain any needed weapons. All the evidence falls short of "organization" and points to nothing more than mere encouragement.

In short, although the Fourth Circuit's opinion incorrectly attempts to parse out a statute and create a new law that Congress never intended to write, even if this Court were to follow *Miselis*, Mr. Betts's conduct falls under the portions of the statute that the Fourth Circuit found to be overbroad and therefore the indictment must be dismissed.

### G. The Anti-Riot Act is a content-based, viewpoint discriminatory restriction on protected expression

Should this Court find the Anti-Riot Act constitutional in scope, it nonetheless must dismiss the indictment because the Act is a content-based, viewpoint-discriminatory restriction on expression that does not pass strict scrutiny. See *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992) (assuming statute not overbroad but striking it down as content-based).

### 1. The Act is content based

Legislation is subject to strict scrutiny if it is content-based, either because it applies only to certain topics or messages, or because it was adopted based on a disagreement with certain ideas. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). The Anti-Riot Act is content-based under both tests.

"[O]n its face," the Act "draws distinctions based on the message the speaker conveys." *Id.* (internal quotation marks omitted). First, it criminalizes expression about riots, not other topics. *Id.* Second, it carves out an exception for expression "for the purpose of pursuing the legitimate objectives of organized labor." 18 U.S.C. § 2101(e); see *Carey v. Brown*, 447 U.S. 455, 457 (1980) (striking down statute barring picketing "but exempt[ing] from its prohibition 'the peaceful picketing of a place of employment

36

involved in a labor dispute'"). And third, it silences the speaker "due to an anticipated disorderly or violent reaction of the audience." *Forsyth*, 505 U.S. at 134.

What is more, the purpose of the Act was "to stifle internal political dissent." *Zalman*, *supra*, at 900. Specifically, Congress intended to prevent black civil rights leaders from traveling the country and stirring local communities to disruptive disobedience. "One sponsor of the measure even identified [certain speakers] by name." *United States v. Playboy Enter. Group, Inc.*, 529 U.S. 803, 812 (2000); see 113 Cong. Rec. 19,364 (1967) (statement of Rep. Cramer) (singling out Stokely Carmichael, among others). "Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles," and are content-based. *Playboy Enter. Group, Inc.*, 529 U.S. at 812.

### 2. The Act is viewpoint discriminatory

A "distinct but related limitation[] that the First Amendment places on government regulation of speech" is that it may not "discriminat[e] among viewpoints." *Reed*, 135 S. Ct. at 2229-30. Viewpoint-based discrimination "is a more blatant and egregious form of content discrimination." *Id.* (internal quotation marks omitted). Here, the Act criminalizes expression of the viewpoint that riots are a positive force, but leaves untouched speech disavowing their use.

### 3. The Act is not narrowly tailored to a compelling government interest.

"Because the Act imposes a restriction on the content of protected speech, it is invalid unless [the government] can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown, v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011). This "is a

demanding standard," and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Id.* (internal quotation marks omitted); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011) ("In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory.").

Mr. Betts does not dispute that preventing violence is a legitimate government aim. But "even the most legitimate goal may not be advanced in a constitutionally impermissible manner." *Carey*, 447 U.S. at 464-65. "Ordinarily," the proper deterrents "to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech." *Free Speech Coalition*, 535 U.S. at 245 (internal quotation marks omitted). With the Anti-Riot Act, however, Congress did not focus on the regulation of violence. Rather, it focuse[d] on pre-riot communications and actions. Because this "curtailment of free speech" is not "necessary to the solution" of prohibiting violence, it is not narrowly tailored to the government's interest. *Brown*, 564 U.S. at 799 (internal quotation marks omitted); *see Free Speech Coalition*, 535 U.S. at 252-53 ("The objective is to prohibit illegal conduct, but this restriction goes well beyond that interest by restricting the speech available to law-abiding adults.").

Importantly, the government has myriad other tools for punishing the violence and vandalism that may accompany riots, including the federal and state statutes earlier discussed. This "existence of adequate content-neutral alternatives thus undercuts significantly any defense of such a statute." *R.A.V.*, 505 U.S. at 395 (alteration and internal quotation marks omitted); *cf. Johnson*, 491 U.S. at 410. Even if the Anti-Riot Act might provide some additional protection, "the government does not have a compelling interest

38

in each marginal percentage point by which its goals are advanced." *Brown*, 564 U.S. at 803 n.9. And given its dearth of use over the years, the proposition is questionable.

"Because there are various other laws at [the government's] disposal that would allow it to achieve its stated interests while burdening little or no speech, the [Anti-Riot Act] is not narrowly tailored." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1205 (9th Cir. 2018) (internal quotation marks omitted).

### H. The Act does not require any nexus between a defendant's mental state and their act

The rule from the common law requires that a defendant's mental state and act coincide for a conviction to be valid. *Morissette*, 342 U.S. at 251 (1952) ("Crime [is] generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand . . . ."). For "while a defendant can be convicted when he both has the *mens rea* and commits the *actus reus* required for a given offense, he cannot be convicted if the *mens rea* relates to one crime and the *actus reus* to another." Wayne R. LaFave, 1 Subst. Crim. L. § 6.3(d) (2d ed.).

An additional rule, grounded in our Constitution and federalist structure, is that "[a] criminal act committed wholly within a State cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress." *Bond*, 572 U.S. at 854 (internal quotation marks omitted).

The Anti-Riot Act violates these principles and due process. At Time "A", the defendant must act with intent to cause one of eleven possible outcomes. 18 U.S.C. § 2101(a)(1)-(4). But the crime is not complete unless she also, at Time "B", performs any other act for any one of those eleven purposes. *Id.* § 2101(a); *see Caminetti v. United States*,

242 U.S. 470, 491 (1917) ("Congress has no power to punish one who travels in interstate commerce merely because he has the intention of committing an illegal or immoral act at the conclusion of the journey."); *Dellinger*, 472 F.2d at 358-59. Yet nothing in the Act cabins the interval between Times A and B or demands that the two contemplated acts have any relation.

The implications of this temporal disconnect are stark. Suppose in January, a woman buys a bus ticket (with a credit card) to participate in what she expects will be an unruly march upstate. The protest is cancelled, and she never attends. In December, her colleague mentions a different rally, for an entirely different cause, that he would like to join downstate, if only he could find nearby lodging. The woman passes along her cousin's contact information; the cousin agrees to host; and the colleague participates in what turns out to be a violent protest.

Even under a conduct-based approach to the statute, the woman is in violation. But her intent at Time A has nothing to do with her purpose at Time B. Somehow, she is culpable of a federal crime for entirely local conduct with no connection to interstate commerce. The lack of concurrence between *mens rea* and *actus reus* turns "virtually every [riot] in the country [into] a federal offense." *Bond*, 572 U.S. at 859 (alteration and internal quotation marks omitted).

### I.  The Anti-Riot Act is unconstitutionally vague

"[A] vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). A statute is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). For statutes where protected expression is at stake, the requirement for clarity is enhanced. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates,*

40

*Inc.*, 455 U.S. 489, 499 (1982) ("If, for example, the law interferes with the right of free speech or association, a more stringent vagueness test should apply.").

The well-established void-for-vagueness doctrine "rests on the twin constitutional pillars of due process and separation of powers." *Davis*, 139 S. Ct. at 2323. The due process concern is "that statutes must give people of common intelligence fair notice of what the law demands of them." *Id.* at 2325 (internal quotation marks omitted). The separation of powers problem arises because only Congress has the "power to write new federal criminal laws," but a vague law means "unelected prosecutors and judges" instead of the legislature take "responsibility for defining criminal behavior." *Id.* The result is a law that leaves the people "no sure way to know what consequences will attach to their conduct," *id.* at 2323, and subjects them to the potential of "the arbitrary deprivation of liberty interests," *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).

The most significant aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* at 575; *see Kolender v. Lawson*, 461 U.S. 352, 358 (1983). "The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940).

The Anti-Riot Act fails to meet the heightened vagueness standard applicable in this case, and is void for vagueness. It doesn't criminalize rioting. Instead, it makes behavior far removed from engaging in an actual riot a federal crime. Pervasive ambiguities in each aspect of this complicated statute—and critically within the very definition of "riot" itself—result in a statute that does not provide guidance to an ordinary person about what is, and is not, a federal crime. And this vagueness allows unelected prosecutors and judges to define what counts as criminal behavior, instead of the legislature. The undeniable lack of prosecutions under this statute in the fifty years of its mostly quiet existence proves its potential for selective enforcement.

**1. The law requires no riot.**

The definition of riot is essential to every other part of the statute. There can be no riot-related activities without understanding what a riot is. And since a riot need not ever occur under the law, there can certainly not be an intent to engage in riot-related activities without a clear definition of riot. More removed still, there can be no use of commerce with the requisite intent.

But the definition of riot is unconstitutionally vague. Layered onto this uncertainty, the riot-related activities each depend upon the vague term riot, but also are replete with other ambiguous words such as "incite," "organize," "promote," and "encourage." None of these terms is sufficiently defined to give notice of what is prohibited. This is made perfectly clear by the Fourth Circuits attempt to parse out the language, while the Seventh Circuit has expressly stated that all the terms are treated the same way. *Dellinger*, 472 F.3d at 361. Finally, the attenuation between the intent required at the time of the travel or use,

42

and the later overt act, which can occur at any point in time, creates a separate source of vagueness.

Each of these problems would be sufficient on its own to declare the statute unconstitutional. Combined, they render the statute incomprehensible. This Court must resist "fashion[ing] a new, clearer law to take its place" and instead "treat the law as a nullity and invite Congress to try again." *Davis*, 139 S. Ct. at 2323.

### 2.  The definition of riot is unconstitutionally vague

The first source of indeterminacy is the definition of the term "riot." The Act defines riot as "an assemblage of three or more persons" that creates a "public disturbance" involving "an act or acts of violence" or "a threat or threats of the commission of an act or acts of violence by one or more persons . . . having . . . the ability of immediate execution of such threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury" to a person or property. 18 U.S.C. § 2102(a). This language raises more questions than it answers.

First, the statute fails to define "public disturbance." As the *Dellinger* dissent noted, this imprecision is dangerous. "New ideas more often than not create disturbances, yet the very purpose of the First Amendment is to stimulate the creation and dissemination of new concepts." *Dellinger*, 472 F.2d at 415 (Pell, J., dissenting) (internal quotation marks omitted). The Supreme Court recently expressed the same concern.

In *Johnson v. United States*, 135 S. Ct. 2551, 2560 (2015), the Court considered a Connecticut statute criminalizing "rioting at a correctional institution," which the government cited as a "straightforward" example of violent conduct. As the Court

43

explained, on first reflection, "[t]hat certainly sounds like a violent felony—until one realizes that Connecticut defines this offense to include taking part in 'any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations' of the prison." *Id.* (*quoting* Conn. Gen. Stat. § 53a-179b(a) (2012)). But "[w]ho is to say which the ordinary 'disorder' most closely resembles—a full-fledged prison riot, a food-fight in the prison cafeteria, or a passive and nonviolent act such as disregarding an order to move." *Id.* (alteration and internal quotation marks omitted). Without a public disturbance, there can be no riot, and the term "disturbance" is plainly ambiguous.

Second, both definitions of "riot" in subsection 2102(a) require the judgment that an act or threatened act (if carried out) "constitute a clear and present danger of, or shall result in," damage or injury to property or person. The "clear and present danger" test comes from *Schenck v. United States*, 249 U.S. 47, 52 (1919). Schenck was convicted of causing insubordination in the military and obstruction of enlistment for distributing pamphlets that urged resistance to the draft, denounced conscription, and impugned the motives of those backing the war effort. In rejecting his First Amendment claim, the Court wrote: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Id.*

The "clear and present danger" test requires a court to evaluate "proximity and degree," and measure gravities of harm and likelihoods of occurrence. *Id.* Specifically, a Court must "make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance" and then "balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Comms.*

44

*Inc. v. Virginia*, 435 U.S. 829, 842-43 (1978). But this test (which appears in no other federal criminal statute) "was never intended to express a technical legal doctrine or to convey a formula for adjudicating cases." *Id.* at 842 (internal quotation marks omitted).

How, then, can the ordinary person know whether an act constitutes a "clear and present danger" of harm? Or anticipate if a threatened act would constitute a "clear and present danger," if taken to completion? Or if her speech will be so persuasive that someone in a group will be inspired to make such a threat? The case law tells the ordinary person that there is no technical formula and that she must instead balance the "character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Id.* at 842-43. This abstract measuring of harms is plagued by the same uncertainty that doomed the phrase "serious potential risk" in the ACCA residual clause. See *Johnson*, 135 S. Ct. 2560. Just as a district court was left without guidance about "how to measure the risk posed by a crime" and "indeterminacy about how much risk it takes for the crime to qualify," the definition of riot does not tell the ordinary person (or ordinary judge) whether an act or threatened act qualifies.

Third, in the case of a riot based on threats, the statute adds the requirement that one or more of the people assembled in the public disturbance have the "ability of immediate execution of such threat or threats." Again, whether anyone possesses the ability to immediately execute a threat may be clear in some cases—for example, if someone with a loaded firearm threatens to shoot someone. But what if someone without a gun says he is so angry he is ready to kill someone? The statute provides no guidance for how to determine whether that person has the ability to immediately execute that

45

threat or not. Maybe the speaker would need to be really large? Or look really

intimidating? Have a past history of violent actions?

To further complicate matters, the statute doesn't ask whether the defendant has

the ability to immediately execute a threat of violence. And the analysis will often be

hypothetical: Does the imagined public disturbance at the time the defendant traveled or

used a facility of interstate commerce involve an individual with the ability to

immediately execute a threat of violence?

In sum, the definition calls for an abstract assessment of chance: Is the person or

group threatening the commission of an act of violence capable of carrying out the threat,

and how quickly could the person or group do so? For the same reasons the ACCA

residual clause was unconstitutionally vague because it left "grave uncertainty about how

to estimate the risk posed by a crime" and "uncertainty about how much risk it takes for a

crime to qualify," *Johnson*, 135 S. Ct. 2557-58, the Anti-Riot Act is void. The three sources

of ambiguity in the definition of riot permit "wholly subjective judgments without

statutory definitions, narrowing context, or settled legal meaning." *Williams*, 553 U.S. at

306. And that unconstitutionality invalidates the entire statute.

### 3. The terms incite, organize, promote, and encourage are unconstitutionally vague

Does "encouraging a riot" include informing members of a group that they are

oppressed? Perhaps openly expressing anti-Semitic, racist, anti-religious, anti-

government, anti-fascist, xenophobic, or anti- COVID-19 lockdown views counts? If the

Act protects the right to advocate for anger at social conditions and government policies,

it apparently does so only when the speaker can ensure that the audience will not

46

interpret such anger as a direct call to action. That is, the distinction between legal and illegal conduct depends on the state of mind of the audience—a distinction impossible to draw. See *Dakota Rural Action*, 416 F. Supp. 3d at 884-85 (preliminarily holding statute criminalizing "encouraging" riots unconstitutionally vague).

"Organize" and "promote" are similarly ambiguous, as even the *Dellinger* majority recognized. See *Dellinger*, 472 F.2d at 361. That they may be sufficiently understandable in the context of other civil statutes does not mean they are clear in the context of this criminal statute.

In *Williams*, the Supreme Court analyzed a criminal prohibition on, among other things, "promot[ing]" child pornography. Williams, 553 U.S. at 289-90. In construing the statute, the Court narrowed the meaning of "promotes" in light of its neighboring verbs, and found it akin to "recommend[s] . . . to another person for his acquisition." *Id.* at 294-95. But that definition makes no sense here. And whereas a verb like "invite" might suggest some sort of ownership or license to conduct an event, a recommendation typically involves a person, place, or event with no ties to the subject. In the context of this case, there is a big difference between inviting someone to riot (planned event) and recommending that someone riot (unplanned event). We once again are left with ambiguities.

This Court should read the terms organize, promote, and encourage with the plain meaning that persons of ordinary intelligence would assign them, and the chilling effect that would follow. Without statutory definitions, these words simply do not "provide a reasonable opportunity to know what conduct is prohibited, [and are] so indefinite as to allow arbitrary and discriminatory enforcement." *Human Life of Wash. Inc. v. Brumsickle*,

624 F.3d 990, 1019 (9th Cir. 2010) (citation and internal quotation marks omitted); see

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984). The result is significant ambiguity, and one

that is compounded by the fact that an actual riot need not occur.

Even the word "incite" strikes at the heart of the vagueness concern presented by

the statute. "Every idea is an incitement," and "the only difference between the

expression of an opinion and an incitement in the narrower sense is the speaker's

enthusiasm for the result." *Gitlow v. People of State of New York*, 268 U.S. 652 (1925)

(Holmes, J., dissenting). For this reason, "[e]loquence may set fire to reason." *Id.*

Dictionary definitions are of no use, including "[t]o urge or spur on; to stir up, animate,

instigate, stimulate," or "[t]o urge or provoke (some action)." Oxford English Dictionary,

https://tinyurl.com/y7s4kewn. The difference between urging and provoking action is

significant when how those terms are interpreted determines whether a person will serve

five years in prison.

Finally, while the Anti-Riot Act makes an effort to exclude protected speech from

its immense grasp, this effort creates further ambiguity about what is, and is not, included

by the statute. This "double negative" problem is addressed above, as it relates to

overbreadth. Assuming arguendo the statute's literal inclusion of mere advocacy does not

prove overbreadth, the cumbersome phrasing would be indecipherable to the ordinary

person, confirming the law is unconstitutionally vague.

### 4. The disconnect between the Act's two elements renders it vague.

As discussed above, there is no temporal nexus between the first element (travel or

use with a certain intent) and the second element (overt act for any listed purpose). This

allows the government to exercise broad discretion over what acts to prosecute. Once an

individual travels or sends an e-mail or uses a credit card with a certain intent, that intent

effectively is frozen in time, authorizing federal prosecution for any subsequent action—

at any time—that qualifies as an overt act. This attenuation between *mens rea* and *actus*

*reus* necessarily means there is no fair warning or clearly discernable standard for

application and adjudication.

>    **J.   The Anti-Riot Act is unconstitutional as applied in this case.**

Mr. Betts particularly notes the force of his interstate-nexus claim. In this case, the

government does not allege interstate or foreign travel, and rests its jurisdiction over

otherwise-local conduct on use of a facility of interstate commerce. In particular, that Mr.

Betts used Facebook to post a flyer. In fact, the only allegations of such use are that Mr.

Betts created a flyer and posted it to his Facebook account where it was subsequently

shared by other individuals. R. 1.

These claims, even if proved, are insufficient to prosecute Mr. Betts for a federal

offense. If a simple Facebook post was enough to confer federal jurisdiction, there would

be no limits to Congress's Commerce Clause regulation of contemporary life in 2020. See

*United States v. Morrison*, 529 U.S. 598, 608 (2000) ("[E]ven under our modern, expansive

interpretation of the Commerce Clause, Congress' regulatory authority is not without

effective bounds.").

Here, Mr. Betts is charged with expression, association, and acts in Illinois, making

an imputed interstate-commerce nexus improper.

>                     Respectfully submitted,
>
>                     SHAMAR BETTS
>                     Defendant

BY:     /s/ Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
Fax: 217-373-0667
Email: Elisabeth_Pollock@fd.org

s/ Thomas A. Drysdale
Research and Writing Specialist
Office of the Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
Fax: 217-373-0667
Email: Thomas_Drysdale@fd.org

CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

<u>s/ Thomas A. Drysdale</u>
Research and Writing Specialist
Office of the Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
Fax: 217-373-0667
Email: Thomas_Drysdale@fd.org