IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| SHAMAR BETTS, | ) |
| | ) |
| Defendant. | )   Case No. 20-cr-20047 |

**DEFENDANT'S SENTENCING COMMENTARY**

NOW COMES the Defendant, SHAMAR BETTS, by and through his attorney, ELISABETH R. POLLOCK of the Federal Defender's Office for the Central District of Illinois, and for his Sentencing Commentary states as follows:

**Introduction**

On May 25, 2020, Minneapolis police officer Derek Chauvin and three of his colleagues murdered George Floyd in broad daylight by kneeling on his neck and choking him to death for almost ten minutes.[1] The murder, which was recorded by cell phone video, sparked a wave of national protests over police brutality unlike any this country has seen for decades. Demonstrations erupted in over 140 cities nationwide when millions of people took to the streets to raise their voices against the senseless, unjustified murders of black men while in the custody of U.S. police departments.[2]

---

[1] https://www.bbc.com/news/world-us-canada-52861726 (visited 6/7/2021).
[2] https://www.nytimes.com/article/george-floyd-protests-timeline.html (visited 6/7/2021)

1

One of the individuals who was profoundly impacted by watching the video of that murder was 19 year-old Shamar Betts, a camp counselor and childcare worker who was living in Urbana, Illinois, unemployed as a result of the COVID-19 pandemic. Shamar's closest childhood friend had been killed by police officers in Chicago in 2017 in a questionable shooting, and Shamar had his own set of experiences with law enforcement which predisposed him to emotional distress when he saw the murder of Floyd on video.[3]

Before this incident, Shamar was by all accounts a gentle, responsible, and dependable teenager who managed to not only survive a series of traumas in his life, but to flourish and secure himself a bright future working with children. He describes himself in an Urbana Park District handbook for the Forest Preschool Program as follows:

**Shamar Betts, Public Program Leader & Nature Play Facilitator** (he/him/his)



My name is Shamar, and I'm proud to be a part of this program, enthralling young minds! This past summer I worked as an Extended Camp Leader and Preschool Camp Leader at Nature Day Camp. I also helped lead Animal Adventure Camp and Preschool Science Camp. I currently work at the afterschool program at Urbana Middle School, teaching kids how to play chess. No matter where I've lived, I have always interacted with nature. I have been a vegetarian for the past four years because I don't believe in harming any living being. I guarantee that your child will be in good hands with me!

---

[3]See Exhibit A – Newspaper Article. Additionally, a psychological report by Dr. Micah Johnson, Assistant Professor of Mental Health Law & Policy at the University of South Florida, speaks to the nature of Shamar's trauma and the reasons why the murder of George Floyd triggered him in such a serious way. A copy of this Report has been disclosed to the Government and will be filed separately under seal for the Court's consideration.

After viewing the video of George Floyd's murder, Shamar was deeply emotionally affected. Watching the video triggered feelings of anger, hopelessness, depression, and exacerbated his pre-existing mental health issues. He did not process those emotions in a productive way. Instead, for days he stewed in his own anger and in his own adverse experiences from his past, all of which led to him creating an internet flyer that called for a riot to fight for black rights and to get justice for George Floyd.[4] That flyer was ultimately shared on social media repeatedly, and on May 31, 2020, dozens of people showed up at Marketplace Mall in Champaign, Illinois, where violence broke out and a significant amount of damage was done to the businesses in the surrounding area. Shamar himself was not present for the entirety of the event, but the riot took on a life of its own, one beyond what Shamar ever expected or intended.[5]

As a result of his actions, Shamar was criminally charged both with inciting a riot in this Court and also with burglary in Champaign County Circuit Court, relating to the theft of pants from an Old Navy store. The Illinois state case is set for sentencing on July 8, 2021, approximately one month from now.

---

[4]Data retrieved from the cell phone of Shamar Betts includes several screenshots of maps of the George Floyd protests, including locations of the cities in which protests were taking place, a screenshot of the announcement of protests in Chicago, and other social media posts concerning the differences in the treatment of black vs. white suspects by police. The existence of these electronic records demonstrate Shamar's mental state and the focus of his attention at the time he created the flyer.

[5]Text messages retrieved from the cell phone of Shamar Betts include the following statements made on June 1, 2020, to username rb******23@icloud.com: "Obviously I am. I feel like all the articles & stuff was unnecessary & even tho I made that post I didn't start the idea of it it's a movement in multiple states & cities as close as Chicago. **I honestly didn't expect it to turn into what it did**…"

## Procedural History

On July 7, 2020, Mr. Betts was charged by indictment with one count of inciting a riot in violation of 18 U.S.C. § 2101. (R. 15) Mr. Betts entered into an open plea of guilty to the Indictment on February 2, 2021. R. 57. His sentencing hearing is scheduled before this Court on June 14, 2021.

## Objections to the Presentence Report

The defense concurs with the position of the Probation Office that there is no sufficiently analogous Sentencing Guideline that resembles "inciting a riot," and as such, the driving force behind any sentence in this case should be the factors under 18 U.S.C. § 3553(a). Therefore, Mr. Betts is facing a sentence of zero up to five years in custody, up to three years of supervised release, a maximum fine of $250,000, and restitution to be imposed at the discretion of the Court pursuant to 18 U.S.C. § 3663 (Victim and Witness Protection Act, hereinafter referred to as "the VWPA"). PSR ¶¶ 64-65, 67, 83, 86. For the following reasons, this Court should decline to impose a restitution order against Mr. Betts.

### A. The VWPA allows for discretionary restitution

Courts lack inherent authority to order restitution and may do so only when authorized or required by statute. *United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016.) The VWPA allows for discretionary restitution, as distinct from the mandatory restitution under the Mandatory Victim Restitution Act ("MVRA"). *United States v. Day*, 418 F.3d 746, 752-53 (7th Cir. 2005). As the Seventh Circuit has explained, "For offenses

4

covered by § 3663, the district court has the discretion to order . . . restitution; in determining 'whether' to exercise that discretion, the district court 'shall' be guided by the considerations set forth in § 3663(a)(1)(B)." *Day*, 418 F.3d at 756.

In order to impose restitution under the VWPA, the Court must consider "(1) the amount of the loss sustained by each victim as a result of the offense; and (2) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i). The amount of loss sustained by the victims is discussed in a later section. However, the second prong should be dispositive in this case. Mr. Betts does not have the financial resources, nor is he likely to have the financial resources in the foreseeable future, to pay restitution. Mr. Betts is 20 years old, has a high school education, and although he has a good employment history, it is one that has produced limited income. PSR ¶¶ 53-54, 56-59. Mr. Betts has no assets, no income, and is indigent. PSR ¶ 60. He clearly does not have the financial resources to pay restitution under the VWPA, so no restitution order should be entered.

### B. The government failed to comply with 18 U.S.C. § 3664(b)(1).

Separate and apart from Mr. Betts' financial status and inability to pay, this Court should strike the government's restitution request as untimely. In implementing the VWPA, the statute requires the Court to issue and enforce an order of restitution in accordance with the provisions in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3663(d). One of the provisions of § 3664 requires the government to provide to the probation officer "a

listing of the amounts subject to restitution" upon the request of the probation officer, "but not later than 60 days prior to the date initially set for sentencing." 18 U.S.C. § 3664(b)(1).

Sentencing in this case is set for June 14, 2021, and has been since February 18, 2021. R. 59. Sixty days prior to June 14, 2021, was April 15, 2021. According to emails sent to alleged victims from the FBI, information was received from many of them in March and April of 2021. The presentence report was initially disclosed on May 3, 2021. However, none of the restitution information was disclosed until May 27, 2021, which was 19 days prior to sentencing. (Gov't Obj. Letter dated May 27, 2021.) The government's failure to comply with § 3664(b)(1) precludes consideration of any of the restitution amounts it claims are attributable to Mr. Betts.

Furthermore, the information provided by the government is incomplete and inaccurate. As detailed in Exhibit C to this Commentary, the government has not provided documentation for a significant amount of the restitution it requests, noting only that it is "waiting on confirmation" or "waiting on response." See Exhibit C – Defendant's Restitution Analysis; Exhibit C-1 – Betts Restitution Chart. If the government believed the victims' losses were not ascertainable 10 days prior to sentencing, it should have informed the Court so the Court could set a date for the final determination of restitution not to exceed 90 days after sentencing. 18 U.S.C. § 3664(d)(5). The government did not make this request, which the Court can only grant upon a showing of "good cause for the failure to include such losses in the initial claim

6

for restitutionary relief." 18 U.S.C. § 3664(d)(5).

To the extent that the government intends to request the Court to make a finding under § 3664(d)(5), the government has failed to show good cause for its failure to include the losses in its initial claim for restitution. It has been more than a year since the offense occurred on May 31 and June 1, 2020. Most businesses completed inventory and assessment of property damage in the month following the offense. There is no good cause for the government to have waited nearly a year to disclose restitution amounts. Therefore, none of the restitution requested by the government should be considered because it is untimely.

### C. Most of the restitution requested is not linked to any "victim" of Mr. Betts' offense.

The term "victim" under the VWPA means "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663(a)(2). The government has asserted that there are 78 entities and businesses that qualify as victims of the Mr. Betts's offense. However, the government has offered no argument as to how each one of these entities and businesses were "were directly and proximately harmed" by Mr. Betts's offense.

Direct and proximate harm means that the loss would not have occurred "but for" the offense and that it was "foreseeable." *See United States v. Clark,* 787 F.3d 451, 463 (7th Cir. 2016); *United States v. Donaby*, 349 F.3d 1046, 1053-54 (7th Cir. 2003). In the case of restitution for offenses resulting in the loss of property, recovery is limited to property which is the subject of the offense, thereby making restitution for

7

consequential damages unavailable. *United States v. Arvanitis,* 902 F.2d 489, 497 (7th Cir. 1990). Consequential damages are defined as "damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act. . . . Damages which arise from intervention of special circumstances not ordinarily predictable." *United States v. O'Brien,* 119 F.3d 523, 535 n. 9 (7th Cir. 1997).

Court decisions reviewing awards of restitution to "victims" under the VWPA and MVRA have required a direct nexus between the offense of conviction and the loss being remedied. *United States v. Randle,* 324 F.3d 550, 556 (7th Cir. 2003). In *Hughey v. United States,* the Supreme Court interpreted the VWPA to authorize a restitution award only with respect to that loss caused by "the specific conduct that is the basis of the offense of conviction." *Hughey v. United States,* 495 U.S. 411, 413 (1990). Thus, under *Hughey,* both the amount of the restitution award and the persons to whom such an award may be directed are limited by the circumstances of the offense for which the defendant has been convicted. *Randle,* 324 F.3d 550, 556 (7th Cir. 2003).

In this case, Mr. Betts posted a message on Facebook and shared a flyer which stated, "BlackLivesMatter, RIOT @ MarketPlace Mall, Time: 3." PSR ¶10. Around 3 p.m. on May 31, 2020, Mr. Betts was observed in a group of 50 to 75 people at the Marketplace Mall. PSR ¶ 12. Mr. Betts was observed leaving Old Navy with a handful of clothing items. PSR ¶ 12. The group of "50 to 75 people" were seen at various different stores and business over the next few hours. PSR ¶¶ 14-16. The only store Mr.

Betts was seen in or coming from was Old Navy. PSR ¶¶ 12-13. And for that he has been charged with burglary in Champaign County Case Number 20-CF-635. PSR ¶ 30.

The government has failed to prove Mr. Betts's offense was the direct and proximate harm of the losses businesses sustained on May 31, and June 1, 2020. Although Mr. Betts was one person who encouraged protesting in the face of George Floyd's murder, he was not the only person who encouraged such action. Protests, riots, and looting occurred on those dates in every major and mid-sized American city. The government has not shown that each and every act taken by the 75 or more individuals near the Marketplace mall was as a result of Mr. Betts's offense. Mr. Betts himself was only seen at a small portion of the businesses named as victims by the government.

At best, most of the restitution claimed by the government is as a result of the consequential damages from the general protesting, rioting, and looting occurring all over the country. Any damage or loss that does not flow directly and immediately from Mr. Betts's actions was merely consequential and was not predictable or foreseeable to him. Furthermore, the government cannot establish a "direct nexus" between the damage and Mr. Betts's specific conduct that was the basis of the conviction.

Another class of restitution that is problematic is the restitution requested for law enforcement. The Seventh Circuit has held that, unless specifically authorized, investigatory and/or prosecution costs incurred by the government are not direct losses relating to defendant's criminal conduct which can be recovered. *United States v. Menza*, 137 F.3d 533, 538-39 (7th Cir. 1998). The government and law enforcement can be

9

victims of an offense, but the government and law enforcement "should bear its own costs in relation to its decisions to investigate and/or to prosecute, even though these decisions may have been motivated by or in response to potential criminal activity." *United States v. Menza,* 137 F.3d 533, 539 (7th Cir. 1998).

The government alleges several law enforcement agencies incurred costs and expenses as a result of investigating and responding to the potential criminal activity in this case. These expenses are not a direct result of the offense and, rather are investigatory costs that cannot be awarded as restitution. Even if the decision was motivated by or in response to potential criminal activity, it is solely law enforcement's burden to bear those costs. Law enforcement in every city was on alert because protesting, rioting, and looting was occurring everywhere. Mr. Betts was not the direct and proximate cause of these expenses.

### D. Even if the Court determines restitution should be ordered, the government has failed to prove the majority of the business sustained loss.

In addition to the legal and timeliness problems with the government's request for restitution, the government has failed to factually support its request for restitution. Because the government's failure for each victim is individual, each victim must be discussed in turn. The analysis of each alleged victim's expenses is contained in Exhibits C and C-1, which conclude that based on the actual proof presented by the government, the maximum total restitution that could be awarded is $352,265.86.

### E. Restitution should not be ordered under this section because it would complicate or prolong the sentencing process.

Under the VWPA, "[t]o the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order." 18 U.S.C. § 3663(a)(1)(B)(ii). Based on the foregoing arguments and the thirty-plus pages of analysis contained in Exhibit C, it would be eminently reasonable for the Court to find that this subsection applies and that no restitution judgment is appropriate here.

## Argument as to Appropriate Sentence

In this case, there is no applicable Sentencing Guidelines range because there is no Sentencing Guideline associated with the Anti-Riot Act. Perhaps because the statute has been so rarely used over the past 50 years, the Commission saw no need to promulgate a separate Guideline for its violation. Regardless, the 3553(a) factors become all the more important due to the lack of Guidance from the U.S. Sentencing Commission. Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available; and

(4) the kinds of sentence and the sentencing range established by the Guidelines.

### A. Nature and Circumstances of the Offense

The end result of the violent gathering that took place at Marketplace Mall on May 31-June 1, 2020, is without doubt extremely serious. Dozens of stores were damaged, merchandise was stolen, and law enforcement were unable to stop the mob. Of all of the people present on that date, the only person charged with a Federal crime is Shamar Betts. None of the people who shared his social media post, attended the riot, or caused the damage are part of this case. Of the damage inflicted, Shamar Betts did not personally partake in the actions that caused the harm. What he did was take some pants out of the Old Navy store once the windows had been broken. And for that, he has pled guilty to burglary in Champaign County Circuit Court. PSR ¶ 30.

In sum, although Shamar's initial social media post may have been the impetus for the location and time of the riot, there were hundreds of other people in the area who desired to gather and rage about the death of George Floyd. Other incidents of this exact nature occurred across the nation, resulting in the deployment of more than 17,000 National Guard troops in at least 28 states.[6]

### A. History and Characteristics of the Defendant

Prior to this incident, no one in Shamar's life could have predicted that his

---

[6] https://www.npr.org/2020/06/01/866472832/violence-escalates-as-protests-over-george-floyd-death-continue ; https://time.com/5847967/george-floyd-protests-trump/ (visited 6/7/21)

mental state at the time of George Floyd's murder would lead him to express himself in the manner he did here. For his entire life, Shamar has been known as gentle and quiet. See Exhibit B - Letters of Support. He had no criminal record prior to this incident, and he works well with children, as evidenced by his chosen employment – being a camp counselor and working at the Boys & Girls Club. PSR ¶¶ 56-59. And he has an outstanding work ethic. Since his incarceration in this case, Shamar has singlehandedly taken on the duties of four separate jobs in the Champaign County Satellite Jail. He does all of the laundry for the whole facility, in addition to cleaning the entire facility, distributing meals, and cleaning the jail's vehicles. *Id.* When he's not working, he reads and makes plans for his future life post-incarceration.

Shamar's inherent gentleness and reserve may be surprising given the nature of his childhood. The Court will read more in detail about Shamar's childhood in the report of Dr. Johnson, but suffice it to say that it was a struggle. His mother and primary custodial parent died when he was 13 years old, after which time he bounced around from relative to relative and state to state, sometimes homeless, until he managed to get himself through high school in Urbana. Then he got himself a place to live, and got himself a job working with kids for the Urbana Park District, and later the Don Moyer Boys & Girls Club. PSR ¶¶ 35-37, 53-58. Indeed, he only became unemployed due to the COVID-19 pandemic, not because he lost a job or quit one. *Id.* at 58. His employment history is even more impressive considering the many personal

traumas he was navigating during his teenage years. He contemplated suicide several times and even attempted suicide on at least one occasion. PSR ¶ 45.

In sum, despite many obstacles and traumas, Shamar Betts had successfully escaped his turbulent childhood by completing high school, obtaining a job, and preparing for his future. Until he saw the video of George Floyd being slowly choked to death, and something inside of him broke. Now, he is a convicted felon in two different jurisdictions. But he has not allowed this mistake to define him, nor will he. Shamar will speak to the Court on his own behalf about his thoughts on the future at the sentencing hearing in this cause.

**B. The Need to Reflect Just Punishment, Afford Adequate Deterrence, Protect the Public from Future Crimes of the Defendant, and Provide Needed Services**

What happened in the United States in the aftermath of George Floyd's murder was a once in a generation wave of public outcry that affected millions of people. Prior to the conflagration of events that led up to Shamar's Facebook post, he was simply a law-abiding teenager with a traumatic past who was working on overcoming his demons. Because of his actions on May 31, 2020, Shamar spent his last year as a teenager in jail, pondering his future. Now that his mental health issues have been identified, he can seek the treatment of a mental health professional when he is released from custody which will certainly assist him in moving forward with his life successfully. This incident was an aberration, not part of a pattern. The Court can expect great things from Shamar in the future once this case is behind him.

### C. Kinds of Sentences Available and the Sentencing Range Established by the Guidelines

As mentioned above, there is no relevant Guideline for this offense, so the Court has discretion to impose any sentence between the statutory minimum and maximum allowed by law. Shamar has already served over a year in custody. He is a young man with a history of issues, but he has the support of his community and has a bright future. He should begin that future now.

WHEREFORE, the Defendant SHAMAR BETTS respectfully requests that this Court impose a sentence of time served, two years of supervised release, a $100.00 special assessment, no fines or restitution, and any other relief the Court deems appropriate.

Respectfully Submitted,

SHAMAR BETTS, Defendant

BY: /s/ Elisabeth R. Pollock
ELISABETH R. POLLOCK
Assistant Federal Public Defender
300 West Main Street
Urbana, Illinois 61801
Telephone: (217) 373-0666
Facsimile: (217) 373-0667
Email: Elisabeth_Pollock@fd.org

*CERTIFICATE OF SERVICE*

I hereby certify that on June 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorney Eugene Miller.

<u>/s/ Elisabeth R. Pollock</u>
ELISABETH R. POLLOCK
Assistant Federal Public Defender
300 West Main Street
Urbana, Illinois 61801
Telephone: (217) 373-0666
Facsimile: (217) 373-0667
Email: Elisabeth_Pollock@fd.org