IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20-CR-20047 |
| | ) | |
| SHAMAR BETTS, | ) | |
| | ) | |
| Defendant. | ) | |

## THE UNITED STATES OF AMERICA'S SENTENCING COMMENTARY

NOW COMES the United States of America, by Douglas J. Quivey, Acting United States Attorney for the Central District of Illinois, and Eugene L. Miller, Assistant United States Attorney, and hereby submits the sentencing commentary of the United States.

## SUMMARY

At a time of national civil unrest, the defendant incited a riot in Champaign, Illinois, that resulted in over $1.8 million in property damage and looting to approximately 73 businesses. This unprecedented riot shook the confidence of the local community. Even as the riot took place, the defendant encouraged others to participate. After the full extent of the riot was known, the defendant described himself as a "hero" and a "legend." For the reasons set forth herein, a sentence of five years of imprisonment followed by three years of supervised release is appropriate, but not greater than necessary, to satisfy the sentencing factors set forth at 18 U.S.C. § 3553(a).

## BACKGROUND[1]

The charges relate to a riot on Sunday, May 31, 2020, that began at Market Place Mall in Champaign, Illinois, and then spread to other businesses in the area. The defendant incited the riot by posting a flyer on his Facebook Account stating, "RIOT @ MarketPlace Mall" at 3, and encouraging people to bring bricks. R. 1 ¶7. The flyer stated, "After the mall we hitting the whole PROSPECT & NEIL." R. 1 ¶7. The area of North Prospect Avenue and Neil Street, where the mall is located, is a commercial area in Champaign. Tr. 5. The flyer included an image of a burning vehicle. R. 1 ¶7. The defendant also posted a message, which accompanied the flyer, stating that he wanted the community to "fear us." R. 1 ¶6. (A copy of the flyer and accompanying message are attached to the criminal complaint. R. 1, Ex. A & B.) This posting took place during a weekend of national civil unrest.

The defendant participated in the rioting and looting by taking clothing from the vandalized Old Navy and Macy stores located at Market Place Mall. R. 1 ¶¶ 9-12. During the riot, the defendant posted on Facebook Live a video stating, "Look what a n[***]a just started…look what a n[***]a just started.  We out here…we out here…we out here…we out here.  All ya'll talking that s[**]t under my post…we out here.  F[**]k that I needs that…we out here." R. 1 ¶9; MJ Tr. 7. During and after the riot, the defendant bragged about starting the riot, stating "I started this," "We out here in this b***h. My

---

[1] This information is either detailed in the Presentence Report, or upon information and belief, will be presented during the sentencing hearing in this case.

s**t went up," "Are you sliding to my riot?," "I'm started this mf riot wish yo a** was here," "Got this b***h bussing," and "I'm a f*****g hero." Tr. 10, 12-13; R. 1 ¶13; MJ Tr. 7.

The riot caused over $1.8 million dollars of damages, including smashed windows and broken doors, and the looting of approximately 73 businesses, including multiple small businesses that were set to reopen on June 1 after being shut down due to the COVID-19 pandemic. R. 1 ¶¶8-10; Tr. 6; MJ Tr. 6. Dozens of off-duty police officers had to be called to the riot, costing local taxpayers over $100,000 and resulting in multiple assaults of and intense confrontations with police officers. Tr. 4-6; MJ Tr. 6. The officers were unable to stop much of the rioting and looting, which continued into the early morning hours of Monday, June 1. MJ Tr. 6. After the riot, the defendant fled to Mississippi, where he was eventually arrested by the United States Marshals Service on a state warrant for burglary and a federal warrant for inciting a riot. R. 1 ¶14; MJ Tr. 7.

## APPLICABLE SENTENCING GUIDELINES

The Anti-Riot Statute, 18 U.S.C. § 2101, is not listed in the Statutory Index to the United States Sentencing Guidelines. U.S.S.G. App. A. Because the Sentencing Commission has not expressly promulgated a guideline for the Anti-Riot Statute, the guidelines direct that the Court should "apply the most analogous offense guideline." U.S.S.G. §2X5.1. The U.S. Probation Office in this case has determined that "there is not a sufficiently analogous guideline."[2] PSR ¶26. The United States objects and asserts that

---

[2] Although the PSR Addendum states there is no analogous guideline according to the Sentencing Commission, the Sentencing Commission has not had a quorum since December of 2018. Thus, any such direction after that date would be the position of a staffer, not the Sentencing Commission itself.

Section 2B1.1 (Property Damage or Destruction; Offenses Involving Stolen Property; *etc.*) is the most analogous offense guideline in this case.

A sentencing court is required to correctly calculate the applicable Sentencing Guidelines, and the failure to do so may require a remand for resentencing. *United States v. Hammond*, 996 F.3d 374, 400 (7th Cir. 2021). Here, the parties agree that Section 2X5.1 applies because no guideline expressly has been promulgated for Section 2101. Section 2X5.1, in turn, directs the sentencing court to apply the most analogous offense guideline. The commentary to Section 2X5.1 further states:

> Many offenses . . . are not listed in the Statutory Index or in any of the lists of Statutory Provisions that follow each offense guideline. Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offense proscribe. The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous.

U.S.S.G. §2X5.1 comment. (backg'd.).

The Guidelines themselves provide no further direction on how to determine the most analogous guideline. The Seventh Circuit does not appear to have addressed the issue, either. Other circuit courts, however, have first used an "elements-based" approach to identify sufficiently analogous offense guidelines, and then looked at the facts in the indictment to determine the *most* analogous offense guideline. Under this accepted approach, Section 2B1.1 is the most analogous offense guideline to the defendant's violation of the Anti-Riot Statute.

Under the "elements-based" approach, the sentencing court compares the relevant elements of the defendant's crime of conviction to the elements of federal offenses

4

already covered by a specific guideline. *United States v. Jackson,* 862 F.3d 365, 372 (3d Cir. 2017); *United States v. Calbat*, 266 F.3d 358, 363 (5th Cir. 2001); *United States v. Nichols,* 169 F.3d 1255, 1270 (10th Cir. 1999*); United States v. Osborne,* 164 F.3d 434, 437 (8th Cir. 1999). Sentencing courts are instructed to conduct this inquiry in a flexible and open-ended fashion because "analogy does not mean identity. It implies difference." *Jackson,* 862 F.3d at 375-76 (quoting *Sturm v. Ulrich,* 10 F.2d 9, 11 (8th Cir. 1925)). Thus, courts applying the elements-based approach look for similar, not identical, elements. In other words, the court must determine what analogous provisions are "within the ballpark." *United States v. Rakes*, 510 F.3d 1280, 1287 (10th Cir. 2007). "[B]y definition, analogous guidelines do not and need not perfectly match the defendant's crime." *United States v. Allard*, 164 F.3d 1146, 1147-50 (8th Cir. 1999). "A perfect match of elements is not necessary (or even expected)." *Jackson,* 862 F.3d at 376. By way of example, "a homicide guideline could be considered to be 'sufficiently analogous' to an offense that does not even require proof of death." *Id.* at 389.

The applicable elements to the defendant's conviction in this case of Inciting a Riot, in violation of Title 18, United States Code, Section 2101(a), are (1) the defendant used a facility of interstate commerce with intent to incite, organize, participate in, or carry on a riot; and (2) during the course of such use or thereafter, the defendant performed or attempted to perform a necessary overt act, namely, inciting, organizing, participating in, or carrying on a riot. A "riot" means a public disturbance involving an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts constitute a clear and present danger of, or result in, damage

...

or injury to the property of any other person or to the person of any other individual. 18 U.S.C. § 2102(a). "To incite, participate in, or carry on a riot" includes, but is not limited to, instigating other persons to riot. 18 U.S.C. § 2102(b). Thus, the gravamen of the defendant's offense is inciting, organizing, participating, and carrying on a public disturbance resulting in "damage or injury to the property of any other person or to the person of any other individual."

Multiple other federal statutes include elements "within the ballpark" of criminalizing damage or injury to property or to another person. For example, various federal statutes include as an element damage or injury to the property of another: 18 U.S.C. § 1361 (Damage to government property) includes the element "willfully injures . . . any property"; 18 U.S.C. § 1363 (Damage to buildings or property) includes the element "willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property"; 18 U.S.C. § 1369 (Destruction of memorials) includes the element "willfully injures or destroys . . . any structure, plaque, statue or other monument."[3] These statutory provisions all fall under Section 2B1.1 of the Sentencing Guidelines, which by its title includes "Property Damage or Destruction."

Similarly, other federal statutes include as an element damage or injury to the person of another: 18 U.S.C. § 111 (assaulting certain officers) includes the element "forcibly assaults . . . any person . . ."; 18 U.S.C. § 112 (protection of foreign officials)

---

[3] Although these offenses also include other elements -- specifically, jurisdictional-type elements – not included in the Anti-Riot Statute, "it is only to be expected that the offense of conviction may include more expansive elements than the federal offense or additional elements missing from the federal counterpart." *Jackson*, 862 F.3d at 382.

6

includes the element "assaults a foreign official . . ."; 18 U.S.C. § 113(a)(6) (assaults) includes the element "assault resulting in serious bodily injury." These statutory provision all fall under Section 2A2.2 of the Sentencing Guidelines, which includes "Aggravated Assault."

Having determined that both Section 2B1.1 and Section 2A2.2 are analogous guidelines to the federal Anti-Riot Statute under the elements-based approach, the Court must determine which is the *most* analogous guideline, that is, "the one that covers the 'type of criminal behavior' of which the defendant was convicted." *Jackson*, 862 F.3d at 376 (quoting *Calbat*, 266 F.3d at 363).

In *United States v. Daley, Miselis, and Gillen,* No. 3:18-CR-25 (NKM), each of the defendants was charged with violations of the Anti-Riot Statute. Unlike this case, however, the indictment charged the defendants with injury to other persons rather than damage or injury to the property of others. Therefore, both the defendants and the United States agreed that U.S.S.G. §2A2.2 (Aggravated Assault) was the most analogous guideline. *See United States v. Miselis, et al.,* Case No. 3:18-CR-25-NKM, Document 142 at 28 (July 15, 2019). Notably, the U.S. Probation Office and the Court applied Section 2A2.2, and no one asserted that there was not a sufficiently analogous guideline under Section 2X5.1.

Here, however, the indictment does not allege injury to the person of others, but instead, it alleges damage and looting to the property of others. Thus, Section 2B1.1, which references federal statutes whose elements criminalize damage to property, is the most analogous guideline. This conclusion is bolstered by the fact that the indictment

7

alleges, and the defendant has admitted, that he was also involved in looting. Section 2B1.1 also is the appropriate guideline for "Offenses Involving Stolen Property," such as a violation of 18 U.S.C. § 2315 (Possession of stolen goods). In fact, the Introductory Comment to Section 2B notes that it addresses "basic forms of property offenses: theft . . . and simple property damage or destruction. These guidelines apply to offenses prosecuted under a wide variety of federal statutes . . ." More specifically, Section 2B1.1 states that "[t]his guideline covers offenses involving theft, stolen property, [and] property damage and destruction . . ." U.S.S.G. § 2B1.1, comment. (backg'd.). Thus, Section 2B1.1 is the most analogous guideline here.

Because Section 2B1.1 is the most analogous guideline to a violation of 18 U.S.C. § 2101, the PSR should have calculated the defendant's offense level under that guideline. The defendant's base offense level is 6 pursuant to §2B1.1(a)(2). His offense level is increased by 16 levels to level 22 because the loss was more than $1.5 million pursuant to §2B1.1(b)(1)(I).[4] This is entirely appropriate:

> The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

---

[4] The PSR calculated the restitution amount as at least $1,549,405.50, although it noted it was expected to be higher as more victims provide the government with their loss amounts. PSR ¶ 86. The defendant did not object to that restitution amount in his initial objections to the PSR. The current amount of restitution based on victim responses is now at $1,832,440.07. *See* Loss Spreadsheet prepared by FBI Special Agent Andrew Huckstadt, attached hereto as Exhibit A.

U.S.S.G. §2B1.1, comment. (backg'd.).

The defendant's offense level also is increased by two levels to level 24 because it involved 10 or more victims under §2B1.1(b)(2)(A). In fact, paragraph 86 of the PSR sets forth that approximately 73 businesses were vandalized and looted during the riot. Arguably, because the number of victims far exceeded 10, an upward variance could be warranted.[5] *Cf. United States v. Miell*, 744 F. Supp. 2d 904, 953 (N.D. Iowa 2010) (varying upward where number of victims far exceeded number necessary for an enhancement under Section 2B1.1(b)(2)), *aff'd*, 661 F.3d 995 (8th Cir. 2011). Moreover, the defendant was clearly aware of the large number of his victims. On June 1, 2020, the evening after the riot, he posted on his Facebook page, "Lmoa yea ima legend for that shit we hit every store in that town 300 deep."

The defendant's offense level is increased by two levels to level 26 because it involved the reckless risk of serious bodily injury pursuant to §2B1.1(b)(16)(A). As the United States will establish during the sentencing hearing, the riot incited and participated in by the defendant resulted in a number of tense confrontations between rioters and armed police officers and business owners. This created a reckless risk of serious bodily injury that was only avoided by the restraint of the police officers and business owners.

The defendant's offense level is increased by four levels to level 30 because the defendant was an organizer of a criminal activity that involved five or more participants

---

[5] Nonetheless, an upward variance will not be necessary because the defendant's advisory sentencing guideline range is the statutory maximum sentence of five years.

and was otherwise extensive pursuant to §3B1.1(a). The riot began with approximately 50 to 75 people, PSR ¶12, and grew in size as the riot continued. Although not required for the enhancement, it is clear that the defendant was aware of the number of participants. For example, he noted on his Facebook page at around 1:27 p.m. (1 ½ hours before the scheduled riot), "Hell yea I got at least 100 mfs saying they sliding on bro." Earlier that day, around 10:31 a.m., he had posted, "Spread the word the more people the sweeter."

Should the defendant accept responsibility for his offense by the time of sentencing, his offense level would be reduced by three levels to level 27 pursuant to §3E1.1(a). To qualify for the reduction, a defendant must (1) demonstrate sincere remorse or contrition; (2) truthfully admit the conduct comprising the offense; and (3) neither falsely deny nor frivolously contest relevant conduct. *United States v. Sandidge*, 784 F.3d 1055, 1063 (7th Cir. 2015). The defendant bears the burden on this issue; he must clearly demonstrate acceptance of responsibility by a preponderance of the evidence to receive this reduction. *See United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir. 1996). "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." USSG § 3E1.1, comment. (n.3).

Based on the foregoing, the United States submits that the defendant's total offense level is 27 (assuming he accepts responsibility) and he faces a sentencing guideline range of 70 to 87 months, which becomes the statutorily authorized maximum sentence of 60 months of imprisonment pursuant to U.S.S.G. §5G1.1(a), to be followed by

10

one to three years of supervised release, a fine range of $25,000 to $250,000, mandatory restitution as determined by the Court, and a $100 special assessment.

## SECTION 3553(a) FACTORS

The United States submits that the Section 3553(a) sentencing factors require a sentence of five years of imprisonment, to be followed by three years of supervised release, mandatory restitution of at least $1,832,440.07 to be determined by the Court at the time of sentencing, no fine in light of the substantial restitution obligations, and a $100 special assessment. First, as detailed previously, the nature and circumstances of the offense involve an unprecedented riot that the defendant started with the intent to create widespread damage, destruction, and loss of security to the entire Champaign, Illinois community during a time of national civil unrest. This was not a protest or demonstration that got out of hand. This is what the defendant intended from its inception. For example, when someone responded to his call for a riot by encouraging him to protest, he posted on Facebook on the morning of the riot, "Naw we gotta turn this b***h up that protest s**t ain't doing nun rn." He also posted that morning, "I ain't tryna burn that b***h I'm tryna loot that mf" and "We finna steal shit." He also posted that morning, "I had to start the movement." The defendant intended to and did incite a riot, with both property damage and looting, starting at Marketplace Mall and then spreading throughout the community. That is exactly what occurred. Having successfully incited a riot in Champaign, he then fled to Mississippi.

Second, unfortunately, the defendant's history includes the diagnoses of Disruptive Mood Dysregulation Disorder and Conduct Disorder in 2016 at the age of 15

11

(and well before the death of George Floyd). PSR ¶ 43. Disruptive Mood Dysregulation Disorder is characterized by "ongoing irritability, anger, and frequent, intense tempter outbursts." *See* https://www.nimh.nih.gov/health/publications/ disruptive-mood-dysregulation-disorder. Conduct Disorder is characterized by aggression to people and animals, destruction of property, deceitfulness, lying, stealing, and serious violations of rules. https://www.aacap.org/aacap/families_and_youth/ fact_for_families/fff-guide/conduct-disorder-033.aspx. The defendant was diagnosed with these disorders when hospitalized in Mississippi following illegal drug use, aggressive behavior towards his aunt, skipping school, and running away from home. PSR ¶ 42-43. Upon release, the defendant was placed on a treatment plan, including medication, but he discontinued his treatment, including stopping his medications, and moved to Champaign, Illinois, to live with his brother. PSR ¶ 44.

The United States submits that a five-year sentence is necessary to reflect the seriousness of the defendant's offense and to provide just punishment for the offense. Additionally, perhaps no other crime demands an appropriate sentence to promote respect for the law than the defendant's criminal conduct in inciting a riot for the very purpose of disrespecting the law, especially the laws that protect the buildings and possessions of local business owners from damage, destruction, and looting.

Moreover, by imposing a sentence within the advisory guideline range, the Court will avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Importantly, a substantial sentence is necessary to afford adequate deterrence to criminal conduct to others who would engage

in riotous conduct. Here, the defendant held himself out to be a "f*****g hero." At the riot, he bragged that, "I started this s**t." About 2 ½ hours into the riot, he posted, "Ima legend for that s**t." Then, the day after the riot, he repeated, "Lmoa yea ima legend for that s**t we hit every store in that town 300 deep." Then, the next day, June 2, he repeated, "Ima real life legend." Those who mistakenly believe they can become a "legend" by inciting and participating in riots must be deterred.

The United States will also recommend that the Court impose the conditions of supervised release set forth in paragraphs 71 to 80 of the PSR. The United States submits that this sentence is sufficient, but not greater than necessary, under the Section 3553(a) factors, as it will further explain at sentencing.

## WITNESSES

In support of the foregoing, the United States intends to present at sentencing the testimony of Special Agent Andrew Huckstadt and Task Force Officer Christopher Elston of the Federal Bureau of Investigation, Lance Carpenter of the Champaign Police Department, and S.S., the owner of Good Vibes in Champaign, Illinois. The United States may also read victim-impact statements submitted by victims pursuant to 18 U.S.C. § 3771.[6]

---

[6] While preparing this sentencing commentary, the United States received the sentencing commentary of the defendant. The United States intends to file a response to the defendant's sentencing commentary, including identifying any additional witnesses who may be necessary to respond to additional matters raised by the defendant therein.

13

WHEREFORE, the United States of America respectfully requests that this Court sentence the defendant, Shamar Betts, to 60 months of total imprisonment, to be followed by three years of supervised release under the conditions set forth in the Presentence Report, restitution of at least $1,832,440.07, no fine, and a $100 special assessment.

Respectfully submitted,

DOUGLAS J. QUIVEY
ACTING UNITED STATES ATTORNEY

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217-373-5891
eugene.miller@usdoj.gov

**CERTIFICATE OF SERVICE**

    I hereby certify that on June 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

        s/ Eugene L. Miller
        Eugene L. Miller, Bar No. IL 6209521
        Assistant United States Attorney
        201 S. Vine St., Suite 226
        Urbana, IL 61802
        Phone: 217/373-5875
        Fax: 217-373-5891
        eugene.miller@usdoj.gov