E-FILED
Sunday, 15 August, 2021  07:04:13 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 20-CR-20047 |
| | ) |
| SHAMAR BETTS, | ) |
| | ) |
| Defendant. | ) |

**THE UNITED STATES OF AMERICA'S RESPONSE TO THE DEFENDANT'S
OBJECTIONS TO THE SECOND REVISED PRESENTENCE REPORT**

NOW COMES the United States of America, by Douglas J. Quivey, Acting United States Attorney for the Central District of Illinois, and Eugene L. Miller, Assistant United States Attorney, and hereby submits this response to the defendant's filed objections to the second revised presentence report. R. 79.

### SUMMARY

The defendant, Shamar Betts, has pleaded guilty to inciting, organizing, participating in, and carrying on a riot that caused over $2 million in loss to approximately 73 businesses. In his recent filed objections to the Presentence Report, Betts repeats the request he made in his sentencing commentary asking the Court not to order any restitution, arguing that (1) the Mandatory Victims Restitution Act does not apply to him; and even if the MVRA applies, (2) Betts's admitted criminal conduct did not cause the loss; and (3) determining restitution is overly complicated. The Court rejected these arguments at the prior sentencing hearing held on June 14, 2021. Nothing

in Betts's recent filing merits the Court reconsidering its prior rulings on these issues.

Betts has not shown that the Court made a manifest error of law in applying the MVRA

or finding that Betts's criminal conduct caused the loss. *See United States v. Rollins*, 607

F.3d 500, 502 (7th Cir. 2010) (holding that motions to reconsider in criminal cases are

treated "just like motions in civil suits"); *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th

Cir. 2000) (movant must establish a manifest error of law to prevail on motion for

reconsideration).

<u>**RESPONSE**</u>

**I.      The Court Correctly Found That The Mandatory Victims Restitution Act
         Applies To Betts's Rioting Offense**

This Court has found that Betts's restitution obligation is mandatory under 18

U.S.C. § 3663A (Mandatory Victims Restitution Act, or MVRA), not discretionary under

18 U.S.C. § 3663, as asserted by the defendant. The Court is correct. By its own terms, the

MVRA applies to all sentencing proceedings for convictions of any offense that is an

offense against property under Title 18 where identifiable victims have suffered

pecuniary loss. 18 U.S.C. § 3663A(c)(1). As the United States asserted prior to the last

hearing, each of the MVRA's criteria is present in this case.

Betts's offense falls under Title 18, as he was convicted of violating 18 U.S.C.

§ 2101,[1] and the prior sentencing hearing established that at least 43 identified victim

---

[1] Betts's objection relies heavily on his claim that his "offense began and ended when he made the flyer and shared it on Facebook." R. 79 at 3. His attempt to limit his criminal conduct ignores both the language of Section 2101 and the allegations of the indictment. Under Section 2101(a), his offense continued when he thereafter performed the overt acts of participating in and carrying on the riot. Once Betts's criminal conduct is properly delineated, his claim that he did not commit an offense against property is without foundation.

businesses suffered pecuniary loss related to both property damage and looting that was the object and result of the defendant's riot. This Title 18 offense is clearly an offense against property. The statutory definition of "riot" includes acts that result in damage or injury to the property of any other person.[2] 18 U.S.C. § 2102(a). Equally important, in this particular case, the riot that Betts incited, organized, participated in, and carried on was principally an offense against the property of other persons.

In his objection, Betts essentially argues that the Court should only look to the elements of his offense (the categorical approach), rather than the facts and circumstances of his crime, in assessing whether he committed an offense against property. If Betts were correct, his argument still fails because the "riot" incited by Betts under Section 2101 meets the statutory definition because it included acts that resulted in property damage.[3]

All of the circuit courts to address this issue, however, have held that a sentencing court may consider the facts and circumstances of the crime that was committed to determine if it is an "offense against property" under the MVRA:

---

[2] Betts argues that applying the MVRA to Section 2101 would result in "absurd results that turn clear non-property offenses into offenses against property," using federal kidnapping under Section 1201 as an example R. 79 at 18-20. Betts's analogy of Section 2101 to Section 1201 is inapposite. The statutory definition of "kidnapping" does not encompass damage or injury to property; the statutory definition of "riot" does. Thus, by definition, Section 2101 encompasses offenses against property and is not an extension of the MVRA to a non-property offense.

[3] Betts confuses the issue by attempting to make a distinction between Section 3663A(c)(1)(A)(ii)'s use of the phrase an "offense against property" and Section 3663A(b)(1)'s use of the phrase an "offense resulting in damage to property." R. 79 at 4-8. The phrase "results in damage or injury to the property of any other person" that the United States cites, however, comes from Section 2101, not subsection (b)(1) of the MVRA, and establishes that Section 2101 is an offense against property.

Ritchie next contends that, if the district court imposed restitution under the MVRA, it erred because his offense of conviction is not an "offense against property" within the meaning of the restitution statute. To get there, Ritchie applies the "categorical approach," under which courts "focus[ ] solely on the elements of the offense of conviction, comparing those to the commonly understood elements of the generic offense identified in the federal statute."

In Ritchie's view, the underlying facts and circumstances of his violation of 18 U.S.C. § 1001 are irrelevant; instead, for a conviction to qualify as "an offense against property" under the MVRA, the offense must "contain an element involving harm to or at least some sort of effect on property." The government responds that the statutory text of the MVRA bars use of the categorical approach, endorsing instead a fact-based approach, or what is in essence the "circumstance-specific approach," under which we "focus[ ] on the circumstances underlying [Ritchie's] prior conviction, not [§ 1001's] elements." The government has the better of this argument.

*United States v. Ritchie*, 858 F.3d 201, 208 (4th Cir. 2017) (holding Section 1001 false statement offense was an offense against property under the MVRA based on the particular facts and circumstances of the case). *Accord United States v. Razzouk*, 984 F.3d 181, 186 (2d Cir. 2020) (holding bribery was an offense against property after considering the facts of defendant's offense); *United States v. Collins*, 854 F.3d 1324, 1335 (11th Cir. 2017) (holding conspiracy offense was an offense against property after considering underlying conduct, rather than elements of crime); *United States v. Sawyer*, 825 F.3d 287, 294 (6th Cir. 2016) (affirming $10 million restitution to EPA after holding that Clean Air Act violation that required cleanup was an offense against property under the MVRA because monetary loss to victim); *Quarrell*, 310 F.3d at 678 (holding that conspiracy qualified as offense against property under MVRA because the unlawful objective at issue damaged land). Here, the facts and circumstances of Betts's crime inciting widespread property damage and looting undoubtedly was an offense against property.

4

Ironically, other defendants have argued that their offense did not qualify as an offense against property because, unlike in Betts's case, there was no physical damage to actual property. *See, e.g., United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014) (rejecting defendant's argument that "against property" requires physical damage to property and apply MVRA to money laundering case). In light of these cases, Betts's argument that a crime whose purpose and result was to cause physical damage to property is not "against property" ignores the plain language of the MVRA and defies common sense.[4]

Betts correctly notes that he would be guilty of inciting a riot even if the property damage had not occurred. R. 79 at 16. He then incorrectly argues that, because the crime could be committed without any property damage, it is not an offense against property. In other words, Betts continues to misapply the categorical approach to the MVRA. The Seventh Circuit has implicitly rejected Betts's argument by finding that the mere possession of access devices (credit cards) was a crime against property under the MVRA, even though the crime is completed by possession of the access devices, without the necessity of proving any actual loss. *See United States v. Moore*, 127 F.3d 635, 637 (7th

---

[4] Betts makes the argument that the MVRA would only apply if he "actually used property damage to incite the riot." R. 79 at 17. Again, however, Betts's argument relies on an incorrect limitation of Section 2101. Section 2101 criminalizes, and Betts was charged with and pleaded guilty to, not only inciting and organizing a riot, but also participating in and carrying on a riot. Notably, Section 2101 is referred to as the "Anti-Riot Act," and not the "Anti-Inciting a Riot Act." *See, e.g., United States v. Miselis*, 972 F.3d 518, 527 (4th Cir. 2020) (addressing defendants charged with violation of "Anti-Riot Act" for travelling in interstate commerce with intent to riot), *cert. denied,* No. 20-1241, 2021 WL 2405168 (U.S. June 14, 2021), and *cert. denied sub nom. Daley v. United States*, No. 20-7377, 2021 WL 2405169 (U.S. June 14, 2021); *United States v. Rundo*, 990 F.3d 709, 712 (9th Cir. 2021) (same).

Cir. 1997) (holding district court was required to impose an order of restitution under

MVRA).

In fact, Betts's categorical approach would mean that no conspiracy offense under

18 U.S.C. § 371 could qualify as an offense against property, because the crime is

completed when there is an agreement and an overt act in furtherance of the agreement,

without any requirement that there be any actual loss or damage to property. Yet, the

courts have uniformly held that a Section 371 conspiracy offense may qualify as an

offense against property under the MVRA, as long as the "underlying purpose was an

offense against property." *Quarrell*, 310 F.3d at 678 (holding MVRA applied to conspiracy

to commit a Title 16 archaeological offense); *see also United States v. Butler*, 694 F.3d 1177,

1183 (10th Cir. 2012) (holding MVRA applied to a conspiracy to commit a Title 16 Lacey

Act offense); *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011) (holding MVRA applied to

a conspiracy to illegally harvest lobsters in violation of Title 16). Likewise, here, the

MVRA applies because the evidence unequivocally demonstrates that Betts's underlying

purpose in inciting the riot was to commit rioting and looting against property, *e.g.*,

posting a photograph of a burning car and telling people to bring bricks and backpacks

to his riot at MarketPlace Mall, before "hitting" the commercial areas at Neil Street and

Prospect Avenue.

In fact, *Quarrell* pointed out that the MVRA specifically defines an offense against

property as including any offense committed by fraud or deceit, but that fraud and

deceit themselves do not always involve an offense against property. Thus, it concluded,

"the MVRA applies to conspiracies when, as with fraud or deceit, their underlying

purpose was an offense against property." 310 F.3d at 678. Given that Betts's underlying purpose was an offense against property, Betts's argument that the MVRA does not apply to him because he did commit an offense against property is entirely without merit.[5]

## II.    Betts's Criminal Conduct Caused the Victims' Losses

Betts second objection claims that he is not responsible for the over $2 million in damages caused by the May 31, 2020, riot that he incited, organized, participated in, and carried on. He claims that the identified businesses collectively suffering massive losses are not "victims" and that it would be overly complicated to determine who (besides him) is actually responsible for the damages. This Court should reject Betts's denial of responsibility for the direct and proximate results of his criminal conduct based on the facts established at the June 14, 2021, sentencing hearing.

On May 25, 2020, George Floyd died in Minneapolis, Minnesota. In the days, following his death, vandalism and fires broke out during protests in Minneapolis. On May 28, 2020, the Minnesota Governor activated the National Guard, stating, "[t]he situation in Minneapolis, is no longer, in any way, about the murder of George Floyd. It is about attacking civil society, instilling fear and disrupting our great cities."

---

[5] Because Betts's Section 2101 violation is an offense against property under either an elements-based approach or a fact-based approach, the Court need not consider whether Section 2101 may fall under another provision of the MVRA, *e.g.,* as a crime of violence under Section 3663A(c)(1)(A)(i). *Cf. United States v. Rundo*, 990 F.3d 709, 719 (9th Cir. 2021) (noting that a "riot" requires either one or more "acts of violence" or one or more "threats" to commit one or more acts of violence). Likewise, the Court need not consider whether the same award of restitution would be appropriate under the Victim Witness Protection Act, 18 U.S.C. § 3663.

https://www.nytimes.com/article/george-floyd-protests-timeline.html. On May 29,

2020, Derek Chauvin was arrested for the murder of George Floyd. Nonetheless, violent

rioting continued that week in Minneapolis, with the Mayor issuing a curfew because

"[w]hat started as largely peaceful protests for George Floyd have turned to outright

looting and domestic terrorism in our region." *Id.* By Saturday, May 30, violent

demonstrations had spread to New York and Atlanta, prompting George Floyd's family

to plead for peace. *Id.* It was in this context of spreading national unrest that Betts

ignored George Floyd's family's call for peace and used the situation to incite, participate

in, and carry on rioting and looting the likes of which has never been seen before, or

fortunately, since in the Central District of Illinois.

As early as 8:39 a.m. on Sunday, May 31, Betts sent his brother a text stating, "I'm

tryna start this riot but shidd nun tho Im smoking waiting on the pawn shop to open."[6]

Betts had created a riot flyer, containing a photo of a riot in progress, including a burning

car. The stated purpose of Betts's flyer was to start a riot at MarketPlace Mall at 3 p.m.,

directing people to bring bricks (to break into stores) and backpacks (to loot

merchandise). According to Betts's flyer, the riot was not to be confined to the mall, but

was to spread to "hit" the "whole" of the commercial areas located at Prospect Avenue

and Neil Street. Betts posted this flyer on Facebook along with a post stating "We gotta

put Champaign/Urbana on the map mfs gone hear and fear us too. They didn't listen

---

[6] The information herein regarding Betts's criminal conduct was presented by Special
Agent Andrew Huckstadt of the Federal Bureau of Investigation during his testimony and
through exhibits admitted at the June 14, 2021, sentencing hearing.

when we were peaceful so we one hit em where it hurts . . . ." Betts referred to both Champaign and Urbana in his post.

Not content to simply post his flyer and incite the riot on social media, Betts began texting his flyer to numerous other individuals. Between 9:48 a.m. and 2:39 p.m. he texted at least 13 other people regarding "his" riot to make sure they knew it was not just "talk." For example, when J.G. texted, "This legit lol we just talking about it," Betts responded, "Legit nigga better slide." Betts continued on, despite being warned by S.B., "yo ass going straight to jail they not finna play wit y'all." In fact, when M.W. warned Betts, "Just protest don't be out there doing to [sic] much li'l boy," Betts responded, "Naw we gotta turn that bitch up that protest shit ain't doing nun rn."

Moreover, Betts made it clear he intended to break into business and loot. For example, when N.M.M. commented about Betts "burning down the mall," Betts responded, "I ain't tryna burn that bitch I'm tryna loot that mf." Additionally, Betts responded, "What hell of it. We coming in that bitch deep," after KiloFrm SB texted "We finna steal shit." When V.M. texted, "bet y'all going in the mall too ?," Betts responded, "Hell yea I'm tryna do this shit inat mf."

Prior to the riot, Betts's took credit for the number of people he expected to participate. Around 10:31 a.m. he texted KiloFrmSB, "Spread the word the more people the sweeter." Then, after sending his brother a photo of the riot flyer, Betts told him, "Go look at my post that bitch going up." Betts efforts paid off. By 1:26 p.m., Betts texted, "Hell yea I got at least 100 mfs saying they sliding on bro." Betts unequivocally took

credit for the large reaction to his post and texts, claiming "I had to start the movement." Thus, Betts's clear intent was to get as many people as possible to riot and loot.

Betts also took credit for the riot during the riot, which began almost precisely at 3 p.m. at MarketPlace Mall, as set forth in his flyer. He bragged to a bystander on video as the rioting and looting unfolded, "I started this shit." He also posted his own video on Facebook, excitedly letting everyone know "We out here," and chiding those who suggested actual rioting and looting would not occur. Following mass looting at the mall, including Old Navy and Macy's (video depicted Betts personally participating in the looting at both stores), the rioters moved to other businesses on Neil Street and Prospect Avenue, just as Betts's flyer instructed. Betts texted the "whole time mfs tryna hit Walmart or target" and was continuing to incite more looting around 4:30 p.m., stating "I need some that's gone be super bussing."[7]

During the riot, Betts also discussed with others looting locations in the Champaign-Urbana area outside of the Neil Street and Prospect Avenue areas. In texts with J.Y. around 4 p.m., Betts commented on "hitting" NuMed, a marijuana dispensary located in Urbana, and the Walmart stores located in Urbana and Savoy. Indeed, the riot spread throughout Champaign-Urbana as Betts hoped, with 43 businesses suffering vandalism and looting in excess of $2 million.

After the riot unfolded, Betts's friends directly warned him about the consequences of starting a riot (*e.g.,* "delete that status off your page . . . cause they gone

---

[7] According to Special Agent Huckstadt's testimony, "bussing" is a slang term used to refer to something that the author believes is really good.

try to get you for starting it"; "Make sure you delete thing with your face and address It's crazy white people in the world"). Nonetheless, Betts found it more important to take credit for the riot that he knew he had incited: At 4:37 p.m., Betts bragged, "Got this bitch bussing." Around 5:20 p.m., after someone told him they did not see him at the riot, he bragged, "I was def in that bitch . . . Ima legend for that shit." Two hours later, he repeated to his brother, "I'm a legend." His brother responded, "I can't wait to see you and get the whole story." Betts was more than happy to share the details of his riot with his brother, replying "On bro I gottchu." Still later, around 8:15 p.m., Betts still was excited about inciting the riot, texting J.J., "You see wtf I did . . . I started that riot."

Betts not only took credit for the riot before and during it, he took even more credit after knowing the full extent of the rioting and looting (which also prompted him to flee to the State of Mississippi to avoid arrest). Around 11:56 p.m. on Monday, June 1 (the day after the riot), Betts texted A.R., "Lmao yea ima legend for that shit we hit every store in that town 300 deep." A.R. responded, ". . . you started a whole f***ing riot." Betts did not disagree. The next day, Tuesday, June 2, Betts texted G.V., "Just thinking bout all this shit looking at everything . . . Ima real life legend."

Once arrested and returned to Illinois, Betts for the first time began to attempt to minimize his responsibility for the riot he incited, organized, participated in, and carried on. At his detention hearing, he suggested that his posting was not responsible for the extensive rioting and looting. Despite having pleaded guilty, he continues the same argument in his objection to being ordered to pay restitution to the identified victims in this case. His objection is without merit.

First, Betts claims that the 43 identified businesses in Champaign-Urbana that suffered over $2 million in vandalism and looting on Mary 31, 2021, are not victims under the MVRA. As a threshold matter, Betts argument is without merit because he relies on an elements-based categorical approach that, as shown *supra,* does not apply to the MVRA. Betts also relies on the Supreme Court's 1990 case, *Hughey v. United States*, 495 U.S. 411, 413 (1990), which predated enactment of the MVRA.[8]

Section 3663A(a)(2) defines a victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." It is correct that Betts did not personally cause all of the damage and looting; instead, he incited and organized the riot by recruiting "at least 100 mfs" to "slide" to "his riot," and then participated in some of the rioting and looting. Where more than one person has contributed to the loss of a victim, the court still should make a defendant liable for payment of the full amount of restitution. 18 U.S.C. § 3664(h); *see also United States v. Moeser*, 758 F.3d 793, 799 (7th Cir. 2014) (affirming district court's decision "against letting [the defendant] off the hook under § 3664(h)").

In his objection, Betts engages in an extensive discussion of the Fourth Circuit's opinion in *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996). R. 79 at 22-26. Betts is correct that *Blake* held that restitution under the VWPA is limited to conduct or a pattern

---

[8] A portion of *Hughey's* holding was superseded by subsequent amendments to 18 U.S.C. § 3663 and the passage of the Mandatory Victim Restitution Act of 1996. *See United States v. Rand*, 403 F.3d 489, 494 n. 2 (7th Cir. 2005). The statutory language interpreted by *Hughey* in the VWPA "is materially different from" the language in the MVRA, which includes the broader phrase "as a result of." *United States v. Washington*, 434 F.3d 1265, 1269 (11th Cir. 2006) (affirming restitution order to a police department under MVRA).

of criminal activity related an element of the offense of conviction. Under this standard, however, Betts is responsible for restitution in this case. Again, to make his argument, Betts ignores that his criminal conduct under the plain language of Section 2101(a) involved the overt acts of organizing, participating in, and carrying on the riot. His offense did not end when he posted the flyer on social media, but continued as long as overt acts "carrying on" the riot occurred. The Seventh Circuit's definition of a "continuing offense" is instructive here, where it held that many offenses continue after a defendant's affirmative actions cease:

> It is true that many continuing offenses, such as escape or bigamy, meet that definition. On the other hand, a conspiracy is a continuing offense which may or may not involve affirmative actions by the defendant after the elements of the offense are met. In other words, the active or passive nature of a defendant's actions has never been the benchmark of a continuing offense . . . . Instead, the focus is on the statutory language. If the statute describes an offense that by its nature continues after the elements have been met, then the offense is a continuing one regardless of the nature of defendant's actions beyond that point.

*United States v. Yashar*, 166 F.3d 873, 877 (7th Cir. 1999) (citations omitted).

An obvious application of this principle, and clear rejection of Betts's claim that he is not responsible for restitution for harms caused after his criminal conduct first met all of the elements of Section 2101, is the crime of bank robbery. In a bank robbery, the statute is violated once the robber obtains the money from the teller by force and leaves the bank. Yet, the offense continues for purposes of restitution as the robber attempts to get away. For example, in *United States v. Donaby*, 349 F.3d 1046, 1054 (7th Cir. 2003), the district court awarded restitution for damage inflicted to a police vehicle during a getaway from a bank robbery. The defendant objected on appeal because the flight

occurred after the robbery and was not an element of the bank robbery offense. The Seventh Circuit affirmed the restitution order on appeal, finding that the "need to elude the police after the robbery is a likely and foreseeable outcome of the crime." 349 F.3d at 1054. Under this standard, the damage to the 43 identified businesses was not only likely and foreseeable, it was the goal of Betts's offense of inciting, organizing, participating in, and carrying on a riot.

Second, Betts makes the fanciful claim that his criminal conduct was not the direct and proximate cause of the rioting and looting. His claim ignores the established facts and applicable law, as well as common sense. A victim's loss is direct and proximate if it was foreseeable and would not have occurred but for the defendant's offense. *Donaby*, 349 F.3d at 1053-54. Betts's protestations to the contrary,[9] the specific property damage and looting at issue would not have occurred but for his offense. The riot and looting began at the precise time and location organized by Betts and moved on to the locations identified in his posting, before moving throughout Champaign-Urbana – as reflected in his text messages. There had never been a riot at Market Place Mall or Prospect and Neil or Champaign-Urbana before Betts posted his flyer; there has not been a riot at the mall or Prospect and Neil or Champaign-Urbana since Betts was arrested. It is beyond

_____

[9] Betts repeatedly claims that the evidence does not establish that "any of the individuals at Marketplace Mall on May 30, 2020 [sic – the riot began on Sunday, May 31, 2020] were there because of Mr. Betts and, even if they were, that they caused property damage." R. 79 at 41. Betts himself disagreed with this claim during the riot, stating as it unfolded at the mall, "I started this s**t." Without belaboring the point further, Betts's argument that his criminal conduct did not cause the rioting and looting on May 31 is against the manifest weight of the evidence. *Cf. United States v. Zmaili*, 498 F. App'x 586, 592 (7th Cir. 2012) (affirming denial of acceptance of responsibility where defendant frivolously contested loss).

obvious that Betts's criminal offense of inciting, organizing, participating in, and carrying on a riot is the "but for" cause of the property damage and looting that occurred on May 31 in Champaign-Urbana, Illinois.

The rioting and looting was not only reasonably foreseeable – it was the object of Betts's criminal offense. It was what Betts intended to occur (as demonstrated by his guilty plea acknowledging intent to incite a riot), and it is what did occur.[10] It was certainly a "likely and foreseeable outcome of" inciting a riot. In fact, Betts's acknowledged as much in his sentencing commentary by noting that there were riots and looting throughout the United States in the days preceding his criminal offense. Any reasonable person would foresee that posting a flyer inciting and organizing a riot and looting on May 31, 2020, would in fact result in a riot and looting in light of the national civil unrest at the time.

The cases Betts cites in support of his claim that he is not responsible for the losses caused by the May 31 riot are easily distinguishable. For example, *United States v. Menza*, 137 F.3d 533, 538 (7th Cir. 1998), applied the VWPA (not the MVRA) and held that the district court did not adequately explain the basis for awarding the DEA restitution in a methamphetamine case. Here, the United States presented the testimony of Special Agent Huckstadt, along with a detailed spreadsheet supported by documentation, to

---

[10] Although reasonable foreseeability is an objective, not subjective test, the facts show that Betts foresaw the rioting and looting that occurred. As established at the June 14 sentencing hearing, it was clear that he wanted rioting and looting to occur throughout Champaign-Urbana.

establish by a preponderance of the evidence the basis for the $2 million plus losses of the 43 identified businesses.

The non-controlling California district court case of *United States v. Shabudin*, 2018 WL 5310683 (N.D. Cal. Mar. 1, 2018) relied on by Betts is particularly inapplicable. The district court initially ordered over $946 million in restitution to the Federal Deposit Insurance Corporation following a bank failure, but was reversed by the Ninth Circuit. *Id.* at *1. On remand, the government conceded that it was "incredibly complicated, if not impossible, to determine the overall loss to those agencies that can be directly attributed to the defendant and the scheme he committed." *Id.* at *2. Thus, the district court denied restitution. *Id.* at 3. Here, it is neither complicated, nor impossible, to determine the loss caused by Betts's criminal conduct. As established at the prior hearing, the 43 identified businesses provided documentation establishing a $2,172,074.90 loss in this case as a direct and proximate result of the May 31 riot.

Betts also suggests that he is not responsible for any rioting and looting that occurred that was not at the mall or on Neil Street or Prospect Avenue. R. 79 at 31-32. As detailed by the law enforcement officers who testified at the prior sentencing, the rioting began at the mall at 3 p.m., spread to Neil Street and Prospect Avenue, and then throughout Champaign-Urbana in an attempt to evade the law enforcement response. This was reasonably foreseeable. In fact, during the riot, Betts himself engaged in texting with another individual discussing "hitting" businesses not only in Champaign and Urbana, but even Savoy (a town with various businesses, including a Wal-Mart, abutting Champaign to the south and miles away from the mall). Betts's phone established he

16

remained in Champaign-Urbana until around 10:30 p.m., when he fled with his brother to Mississippi. Betts's disavowing responsibility for these damaged businesses is particularly disingenuous given his proud text, "Lmao [*i.e.,* laughing my a** off] yea ima legend for that shit we hit every store in that town 300 deep."

In his objection, Betts also continues to argue he should not be required to pay restitution because many of the businesses received some compensation from their insurers. R. 79 at 39-40. As the United States noted in its prior sentencing commentary, the MVRA prohibits a court from considering whether a victim has received or is entitled to receive insurance in determining restitution:

> In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining restitution.

18 U.S.C. § 3664(f)(1)(B).

Betts argues, however, that the Court may consider insurance in determining if the complexity exception in Section 3663A(c)(3)(B) applies. Betts relies on the Tenth Circuit opinion in *United States v. Gallant*, 537 F.3d 1202, 1254 (10th Cir. 2008). Even if the Seventh Circuit would agree with the Tenth Circuit (which is not clear), *Gallant* is distinguishable on its facts. There, the Tenth Circuit affirmed the district court's refusal to order restitution to the FDIC as the receiver of a failed bank in a complicated fraud case because it would prolong the proceedings. *Id.* Here, Betts's claims notwithstanding, there are no complex issues of fact that would prolong the sentencing process "to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). The United States has already

established the cause and amount of the victims' losses by a preponderance of the

evidence. Determining restitution will not prolong the sentencing process, as in *Gallant*.

The Court is in a position to order restitution at the scheduled August 19, 2021,

sentencing hearing.[11] *See United States v. Malone*, 747 F.3d 481, 487 (7th Cir. 2014) (holding

it would have been an abuse of that discretion to apply the complexity exception because

the calculation of the amount of restitution was simple).

## III.   The Loss Amount In The Presentence Report Is Correct

Finally, Betts objects to the $2,274,001.96 loss amount in the Presentence Report.

PSR ¶ 30. First, he repeats his restitution argument that he is not responsible for the

damages incurred by the 43 identified businesses on May 31, 2020. For the reasons set

forth *supra*, as well as the reasons articulated in the prior sentencing commentary of the

United States, the Court should reject this argument. Without repeating those arguments

in full, the facts unequivocally show that the May 31 riot in Champaign-Urbana would

not have occurred but for Betts inciting, organizing, participating in, and carrying on the

riot.[12]

---

[11] Betts previously raise several procedural objections to restitution, which this Court overruled, including claiming that he had received inadequate notice of the restitution amount. The Seventh Circuit recently rejected similar claims in a different case. *See United States v. Robl*, 2021 WL 3478644 (7th Cir. Aug. 9, 2021).

[12] At his detention hearing, Betts suggested others might have been involved in inciting the Champaign riot. A review of social media, including Betts's texts and Facebook posts, did not identify any other individual responsible for inciting and organizing the riot (as opposed to merely participating in it). Moreover, Betts's has never identified any such individual. He has consistently taken sole responsibility for the riot, *i.e.*, "I'm a legend," not "We're a legend."

Second, he objects to portions of the loss related to certain Champaign-Urbana businesses located farther away from the mall and to law enforcement overtime. He acknowledges, however, that even if those objections were sustained, it would not affect his guidelines calculation. R. 79 at 44-45. As argued, *supra,* the evidence establishes by a preponderance of the evidence that Betts is responsible for the damages caused by the riot the occurred in Champaign-Urbana on May 31, 2021. It defies common sense under these facts to argue that he is responsible for some of the damages, but not all of it.

Additionally, Betts incorrectly states that "the government noted at the previous sentencing hearing that it did not intend to request restitution for local police overtime as it is barred by law." R. 79 at 44. In fact, the United States set forth authority in its prior sentencing commentary that would allow for restitution for the $101,927.06 in police overtime that was incurred in responding to Betts's riot. Nonetheless, after consulting with law enforcement, the United States' position was, and remains, that any restitution that is paid should first go to the victim businesses. Therefore, the United States noted it did not intend to further litigate the restitution issue. Likewise, regarding loss amount, given that this amount will not affect the guidelines calculations, the United States has no objection to the Court determining that a ruling on this discrete issue is unnecessary because the matter will not affect sentencing. *See* Fed. R. Crim. P. 32(i)(3)(B).

WHEREFORE, for the reasons stated herein and in its prior filings, the United States of America respectfully requests that this Court sentence the defendant, Shamar Betts, to 60 months of total imprisonment, to be followed by three years of supervised release under the conditions set forth in the Presentence Report, restitution of $2,172,074.90, no fine, and a $100 special assessment.

Respectfully submitted,

DOUGLAS J. QUIVEY
ACTING UNITED STATES ATTORNEY

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov